COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Powell and Senior Judge Annunziata
Argued by teleconference


COMMONWEALTH OF VIRGINIA

                                                          MEMORANDUM OPINION<sup>*</sup> BY
v.        Record No. 0090-10-1                    JUDGE CLEO E. POWELL
                                                                JUNE 14, 2010

KELSEY ERIN HELVENSTON


            FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                            Norman A. Thomas, Judge

            Erin M. Kulpa, Assistant Attorney General (Kenneth T. Cuccinelli,
            II, Attorney General, on brief), for appellant.

            James O. Broccoletti (Zoby & Broccoletti, P.C., on brief), for
            appellee.


        Kelsey Erin Helvenston ("Helvenston") was indicted for second-degree murder, in violation

of Code § 18.2-32, and use of a firearm in the commission of a felony, in violation of Code

§ 18.2-53.1.  Prior to trial, she filed a motion to suppress statements she made to police officers,

which the trial court granted.  Pursuant to Code § 19.2-398, the Commonwealth appealed the trial

court's decision to this Court.  After reviewing the record, we hold that the trial court erred in

granting the motion to suppress.

                                    BACKGROUND

        In the early morning hours of March 21, 2009, Anthony Sanderlin ("Sanderlin"), was

shot multiple times in his apartment.  After being shot, he managed to crawl to a neighbor's

residence to get help, however; Sanderlin ultimately died from his injuries.

---

        <sup>*</sup> Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Detectives Jarvis and Smith of the Norfolk Police Department were assigned to investigate the shooting. Upon arriving on the scene, the detectives found the back of a cell phone in the living room of Sanderlin's apartment. Additionally, the detectives noted the trail of blood left by Sanderlin as he crawled for help and a second trail of blood leading from the apartment into the parking lot.

One of Sanderlin's neighbors, Jessie Carter ("Carter"), informed the detectives that earlier that morning he had been sitting near his window, which overlooked the parking lot. Carter stated that, at approximately 1:00 a.m., he noticed a white car pull into the parking lot and park near the dumpster. According to Carter, three people got out of the car: a female and two males, one of whom was Sanderlin. Carter described the female as either white or Hispanic with black and blonde hair; he described the second male as wearing a grey hoodie.

Carter watched as all three walked up to Sanderlin's apartment building. Moments later, Carter heard several gunshots and saw the female run out of the apartment building. According to Carter, she got into the white car, started it up, backed out of the parking space, and waited. A minute later, he saw the male run out of the apartment building and get into the car. The car then drove away. Shortly thereafter, Carter heard Sanderlin calling for help.

The detectives interviewed Sanderlin's sister and her husband and learned that someone driving a white car had picked up Sanderlin from his sister's house on the night that he died. The detectives also determined that the cell phone back found at the scene likely belonged to Sanderlin's cell phone. As a result, the detectives obtained a search warrant for Sanderlin's cell phone records. Sanderlin's cell phone records revealed that, shortly before he died, Helvenston had called Sanderlin.

On March 22, 2009, the detectives attempted to contact Helvenston. Detective Jarvis called Helvenston's cell phone and left a message informing her that they wished to speak with

her.  Approximately thirty minutes later, Helvenston contacted Detective Jarvis.  She informed him that she would meet the detectives at her house in about thirty minutes.

Thirty minutes later, Helvenston returned home; the detectives arrived immediately thereafter.  Helvenston agreed to accompany the detectives to the Police Operations Center ("POC").  The detectives gave her directions, and Helvenston drove to the POC in her vehicle, a white Mitsubishi Galant, with the detectives following behind her.

At the POC, Helvenston confirmed that she was in Norfolk in the early morning hours of March 21, 2009.  At that point, the detectives advised Helvenston of her Miranda rights, and Helvenston indicated that she waived her rights by signing a Norfolk Police legal rights advice form.

The detectives then turned on a video recorder before resuming their questioning of Helvenston.  Helvenston explained that she and her boyfriend, Shawn Hunter ("Hunter"), had traveled to Norfolk to get his cell phone from Sanderlin.  Helvenston had previously called Sanderlin and arranged to pick him up from a club.  According to Helvenston, she and Hunter picked Sanderlin up from the club, got the cell phone back from him, and then dropped Sanderlin off at his apartment.

At that point, the detectives believed that Helvenston was lying to them, as her account of the events of that evening did not match Carter's.  However, Detective Jarvis specifically stated that he did not believe that Helvenston was involved in Sanderlin's murder; rather, they believed that Hunter had murdered Sanderlin and Helvenston "was protecting him by not talking about his involvement."

As the questioning progressed, the detectives used a number of different tactics to convince Helvenston of the seriousness of the situation and to convince her to tell them what actually happened.  Approximately twenty-five minutes into the interrogation, Detective Smith

told Helvenston that his job was to make sure that he put her in prison for killing someone. Detective Smith then left the room and Helvenston stood up to leave. The following conversation then took place:

> DETECTIVE: Kelsey, Kelsey, Kelsey, sit, sit, sit down. I'll need your cell phone for now. I need your cell phone.
>
> HELVENSTON: For what reason?
>
> DETECTIVE: Because you can't have your cell phone in here.
>
> HELVENTSON: I'm leaving.
>
> DETECTIVE: Kelsey, listen to me. It's changed. Okay? What I want you to understand is there's people -- this is not -- this is not an accident, sweetheart, it's not an accident.

Helvenston continued to deny any involvement in Sanderlin's death. Approximately forty minutes later, Detective Jarvis told Helvenston that they would be taking her cell phone "and everything else from you . . . and that will be pretty much it." He then informed her that he was contacting the magistrate to "get everything rolling," and left the room.

A few minutes later, Detective Jarvis returned to the interview room with a manila envelope, which he handed to Detective Smith. As he did so, he said "If you get the chance the phone and rings and jewelry [inaudible] stuff." He then turned and left the room again.

Approximately twenty minutes later, Detective Smith told Helvenston to put her cell phone into the manila envelope. Five minutes later, Detective Jarvis returned to the interview room and stated:

> I'm going to go ahead and take your jewelry and stuff, okay, and your rings and your phone. They have got to go. I don't know what you guys talked about. I'm pretty much done. I want to go home . . . .

Helvenston complied. Thereafter, Detective Jarvis continued speaking with her.

- 4 -

Ultimately, Helvenston admitted to shooting Sanderlin with his own gun when he tried to rape her. According to Helvenston, Hunter, who had been in the other room at the time Sanderlin allegedly attacked Helvenston, took Sanderlin's cell phone to prevent him from calling for help. Helvenston then admitted that she had fled from the apartment, got in her car, and waited for Hunter. Hunter came out of the apartment building approximately a minute later, got in the car with Helvenston, and the two drove away.

Helvenston was arrested and charged with second-degree murder.

Prior to trial, Helvenston moved to suppress her statements, arguing, among other things, 1) that her confession was the result of an illegal custodial interrogation and 2) that the detectives did not honor her invocation of her right to remain silent. The Commonwealth maintained that the detectives had probable cause to arrest Helvenston for second-degree murder, as an accessory after the fact, and for lying to the detectives during their investigation of Hunter's role in the crime. After a hearing and multiple briefs both in support and opposition of the motion, the trial court issued a letter opinion granting the motion to suppress, stating:

> The Court finds that defendant's interview escalated into a custodial interrogation during its second hour, at or immediately prior to the time that her cell phone and other of her personal effects were involuntarily taken from her and placed in a manila envelope.
>
>     \*    \*    \*    \*    \*    \*    \*
>
>     . . . [I]n the actual demand for her phone and personal belongings, the detectives placed her in a situation where any reasonable person in her position would perceive such restraint on their individual freedom of movement as to equate to an arrest. Defendant was not free to leave, the Court concludes, and could not reasonably have perceived that she was free to do so. The circumstances constituted a *de facto* arrest.

The Commonwealth appeals.[1]

---

[1] The trial court also found that Helvenston "did invoke her Fifth Amendment right against self-incrimination by her statement, which invocation the detectives did not [] honor."

ANALYSIS

Upon review of a trial court's decision to grant a motion to suppress, "[w]e view the evidence in a light most favorable to . . . the prevailing party below, and we grant all reasonable inferences fairly deducible from that evidence." Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). Furthermore,

> Questions of reasonable suspicion and probable cause to make a warrantless search are subject to *de novo* review on appeal. See McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc). "In performing such analysis, we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them[,] and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." Id. at 198, 487 S.E.2d at 261.

Archer v. Commonwealth, 26 Va. App. 1, 8, 492 S.E.2d 826, 830 (1997).

The Commonwealth argues that the trial court erred in concluding that the detectives lacked probable cause to arrest Helvenston at the time they took her belongings. Specifically, the Commonwealth contends that the detectives had probable cause to arrest Helvenston on a number of crimes, including second-degree murder, obstruction of justice, and accessory after the fact. Helvenston, on the other hand, argues that the Commonwealth's argument is "unsupported by the factors used by the court to determine whether a police officer has probable cause to arrest an individual." Helvenston notes that Detective Jarvis specifically testified that during the interrogation he considered her a witness, not a suspect.

It is well established that evidence obtained as a result of illegal searches and seizures is inadmissible at a criminal trial. See, e.g., Mapp v. Ohio, 367 U.S. 643, 655 (1961). Furthermore, "'[w]hether [a warrantless] arrest [is] constitutionally valid depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it.'" Jefferson v.

---

Although we granted the Commonwealth's petition for appeal on this matter, the Commonwealth withdrew the question presented regarding Helvenston's invocation of the right to remain silent.

- 6 -

Commonwealth, 27 Va. App. 1, 12, 497 S.E.2d 474, 479 (1998) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

> [A] warrantless arrest that is not based upon probable cause is unconstitutional and evidence seized as a result of an unconstitutional arrest is inadmissible, without regard to the officer's good faith and reasonable belief that he was not factually or legally mistaken.

Ford v. City of Newport News, 23 Va. App. 137, 145, 474 S.E.2d 848, 852 (1996); see also Dunaway v. New York, 442 U.S. 200, 216 (1979) ("detention for custodial interrogation -- regardless of its label -- intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest"); Brown v. Illinois, 422 U.S. 590, 601-03 (1975) (recognizing that, if a causal relationship exists between an illegal arrest and the procurement of the inculpatory statement, the exclusionary rule applies to that statement). "Miranda warnings . . . do not alone sufficiently deter a Fourth Amendment violation." Brown, 422 U.S. at 601.

> To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to probable cause."

Maryland v. Pringle, 540 U.S. 366, 371 (2003) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)).

Furthermore, "[p]robable cause is 'determined by objective facts,' not the 'subjective opinion' of a police officer." Golden v. Commonwealth, 30 Va. App. 618, 625, 519 S.E.2d 378, 381 (1999) (quoting Klingler v. United States, 409 F.2d 299, 304 (8th Cir. 1969)). "Thus . . . 'an arrest supported by probable cause is not made unlawful by an officer's subjective reliance on . . . an offense different from the one for which probable cause exists.'" Id. (quoting State v. Huff, 826 P.2d 698, 701 (Wash. Ct. App. 1992)). In other words, as long as, at the time of the arrest, there exists probable cause that the defendant committed any crime, the arrest is not an illegal arrest.

Code § 18.2-460(D) specifically states:

> Any person who knowingly and willfully makes any materially false statement or representation to a law-enforcement officer . . . who is in the course of conducting an investigation of a crime by another is guilty of a Class 1 misdemeanor.

In the present case, the record clearly demonstrates that, at the time of Helvenston's *de facto* arrest, the detectives were investigating Hunter for the murder. It is equally clear that the detectives had a reasonable belief that Helvenston was not telling them the truth. Hevenston's version of events differed significantly from the statements the detectives received from Carter. Further, the trial court specifically found that, during police questioning, Helvenston "was coy and deceptive," which served "only to convince [Detectives] Jarvis and Smith . . . that she was holding back information about the circumstances surrounding [the shooting]." Accordingly, the record clearly demonstrates that, at a minimum, the detectives had probable cause to arrest Helvenston for obstruction of justice in violation of Code § 18.2-460(D).

## CONCLUSION

For the foregoing reasons, the trial court erred in finding that the detectives lacked probable cause to arrest Helvenston at the time they took her belongings. As such, Helvenston's statements up to the point where the trial court found that she invoked her right to remain silent are admissible.

<u>Reversed.</u>