COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Raphael, Lorish and Callins
Argued at Lexington, Virginia


JENIFER REBECCA GORDON

                                                    MEMORANDUM OPINION* BY
v.       Record No. 1676-22-3                  JUDGE STUART A. RAPHAEL
                                                       OCTOBER 3, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Stacey W. Moreau, Judge[1]

Gregory T. Casker for appellant.

Stephen J. Sovinsky, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


This case involves two sets of charges joined for trial.  Jenifer Gordon was convicted of

strangulation and assault and battery of her stepdaughter, as well as assault and battery on a law-

enforcement officer and resisting arrest when law-enforcement officers arrested her for the

crimes against her stepdaughter.  Because the evidence surrounding each set of offenses would

have been relevant and admissible in a trial on the other set, we find no reversible error in the

trial court's decision to conduct a single trial.  We also reject Gordon's argument that the officers

violated the Fourth Amendment by entering her home without a warrant to arrest her.  The trial

court properly found that the arrest began outside the home, when an officer first touched

Gordon to arrest her, thus justifying the officers' subsequent pursuit of Gordon as she retreated

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The Honorable Timothy W. Allen presided over the motion to suppress.

inside. We also reject Gordon's claim that the evidence failed to prove strangulation or assault and battery on a law-enforcement officer. So we affirm her convictions.

BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard" the defendant's evidence when it conflicts with the Commonwealth's evidence, "regard as true all the credible evidence favorable to the Commonwealth," and read "all fair inferences" in the Commonwealth's favor. *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

On July 29, 2021, 14-year-old S.G. was at home in her family's camper with Gordon (S.G.'s stepmother) and her younger brother. Believing that S.G. had "backtalked her" when Gordon criticized S.G. for doing a poor job cleaning the campground bathroom, Gordon approached S.G., backed her up against the kitchen cabinets, grabbed her by the throat with both hands, and squeezed. S.G. could "hardly" breathe and could not speak. She felt "dizzy" and "lightheaded." She tried to resist, but Gordon told her to stop or "she would just squeeze harder." Eventually, Gordon let go. S.G. decided not to tell her father about the incident, fearing he "would confront [Gordon] about it, and after he'd leave in the morning the punishment would be ten times worse."

The next day, July 30, S.G. and her brother were outside the camper when Gordon returned home from running errands. S.G. wore socks but no shoes. Gordon asked S.G. to come inside to talk. Gordon sat on the couch and asked S.G. several questions; S.G., standing in the doorway, refused to answer. When Gordon asked S.G. "what ma[de her] privileged enough to wear socks outside," S.G. "g[a]ve her a smart answer." Gordon stood up, grabbed S.G. by her

hair, and threw her to the floor, causing S.G. to hit her back against a drink cooler. Trying to get away, S.G. ended up with her back against the couch. After Gordon asked another question that S.G. did not answer, Gordon put her hands around S.G.'s throat and squeezed even "tighter" than the day before. S.G. could not breathe or talk. She grew dizzy, and her vision faded. Afraid of "dying," S.G. did not fight back, and Gordon eventually let go.

S.G. left the camper. She was afraid to tell her father what happened. Instead, she started to walk to the hospital, "the only place" where she knew she could "get help." As cars approached her, S.G. hid in a cornfield, fearing that Gordon had followed her.

One motorist noticed S.G. and stopped out of concern for her safety. S.G. appeared shocked and frightened. The motorist testified at trial that he saw marks "like fingerprints" on S.G.'s neck. He agreed to drive S.G. the rest of the way to the hospital, stopping at a Dairy Queen to buy her something to eat. At the hospital, he gave S.G. his phone number and waited for her to walk inside before departing.

S.G. underwent a three-hour examination by a forensic nurse examiner, Samantha Ledger. Ledger conducted a "head to toe assessment," took photographs, and had S.G. demonstrate on a mannequin what Gordon had done to her. Ledger also measured S.G.'s neck and scheduled a recheck visit to assess the swelling. On July 30, S.G.'s neck measured 32 centimeters; on August 16, it was 30.5 centimeters.

Ledger testified at trial that S.G.'s symptoms included: inability to breathe or talk, throat pain, blurred vision, feeling faint, and a headache. Ledger also contemporaneously recorded that S.G.

> had five red areas to the anterior neck, an abrasion to her anterior
> neck, multiple scattered petechiae to the anterior neck, . . . four red
> areas to the left lateral neck, two abrasions to the left lateral neck,
> petechiae on the left neck, side of her neck, multiple scattered
> areas of redness to the posterior neck. She had an abrasion to the
> posterior neck. On her shoulder she had, and her back she had two

red areas to the left shoulder, one red area to the right shoulder, one red area to the midback. On her left arm she had multiple scattered abrasions to the left.

After examining S.G. at the hospital, Ledger promptly contacted law enforcement and child protective services. Investigator N.W. Spencer of the Pittsylvania County Sheriff's Office responded to the call and went to the hospital to meet with S.G. He noticed that "[s]he had red marks on her neck, kind of oval shaped, and . . . some on the back of her neck as well."

Spencer then met with Deputy Sheriff Monica Gibson, and they headed to the camper where the Gordons lived. The officers knocked on the door; Gordon answered, wearing a robe. Gordon sat on the stairway outside the camper's door. After discussing the strangulation allegations, the officers informed Gordon that they were arresting her. She abruptly stood up and turned to reenter the camper; the officers "stepped to grab her, to keep her from going back inside," but Gordon "pulled away." They pursued her, entering the camper.

The group ended up in the bedroom, where Gordon's husband was sitting on the bed. The officers "struggle[d]" to handcuff Gordon—there was a verbal back-and-forth for five to ten minutes before Spencer grabbed Gordon by the wrists and pulled her across the bed; a struggle ensued. During the scuffle, Gibson said, "stop biting me." Gordon was biting at Gibson's chest, which was protected by body armor. The officers eventually managed to take Gordon into custody.

A week later, on August 6, Spencer returned to the camper with a warrant to arrest Gordon for assault and battery on a law-enforcement officer, a charge stemming from the biting incident. That same day, Gordon admitted to a witness that she had tried "to bite Deputy Gibson" but "couldn't because [Gibson's] vest got in the way." Spencer overheard that remark from about 15 yards away, but Gordon's statement was not captured on Spencer's body-camera recording.

- 4 -

Gordon was charged with two counts of strangulation, one count of assault and battery on a law-enforcement officer, and two counts of obstruction of justice.[2]

Gordon moved for separate jury trials, one for the strangulation charges and the other for the arrest-related charges. The trial court denied the motion, finding "that justice does not require separate trials, that it would not be prejudicial, [and] that . . . the transactions are connected."

Gordon also moved to suppress "any and all evidence derived from law enforcement officers['] . . . entry into her home." Spencer and Gibson testified at the hearing on that motion, and the Commonwealth introduced Gibson's body-camera video. The court denied the motion, finding that: (1) once Gordon "came out of the camper . . . she was in public," and (2) Gordon tried to reenter her home after being informed she was under arrest and after the officers "got a hold of her." The court concluded: "Obviously if . . . she was under arrest at that point in time, they certainly have a right to make a warrantless entry into private property, if it started in an area which was in public view . . . ."

At trial, Ledger qualified as an expert in forensic nursing and described the effect of pressure on a person's neck. She noted that it takes only "four pounds of pressure to occlude" the vein responsible for carrying blood from the brain to the heart. That is "about the same amount of pressure as pulling the trigger on a gun." And when arteries "are occluded, it only takes ten seconds for death to occur." For every second that the blood is obstructed, "millions of brain cells die." Ledger described the symptoms of blood obstruction, including a hoarse voice, difficulty swallowing, coughing, difficulty breathing, visual or hearing changes, loss of consciousness, fainting, seizures, memory loss, dizziness, headaches, and vomiting.

---

[2] At a motions hearing on April 28, 2022, the Commonwealth nolle prossed one of the obstruction-of-justice charges.

Gordon testified and denied the strangulation allegations. She claimed that she had her hands on S.G.'s shoulders during the first incident, and her forearm across S.G.'s collarbone during the second incident. She denied ever biting Gibson.

The jury found Gordon guilty of assault and battery for the July 29 incident involving S.G.; strangulation for the July 30 incident involving S.G.; assault and battery on a law-enforcement officer for the July 30 incident involving Gibson; and resisting arrest on July 30. Gordon was sentenced to 7 years and 18 months' incarceration, with 4 years and 21 months suspended.

ANALYSIS

A.  *The trial court did not err in denying Gordon's request for separate trials (Assignment of Error 1).*

Gordon argues that she was entitled to two trials, one for the charges related to S.G.'s allegations and the other for the arrest-related charges. We find no reversible error.

"[W]hether an accused . . . can be tried in a single trial for all offenses then pending against that defendant is a matter resting within a trial court's sound discretion." *Brooks v. Commonwealth*, 73 Va. App. 133, 141 (2021) (quoting *Commonwealth v. Minor*, 267 Va. 166, 172 (2004)). But the trial court's interpretation and application of the joinder and severance rules "presents a question of law that we review *de novo*." *Id.* (quoting *Cousett v. Commonwealth*, 71 Va. App. 49, 57 (2019)).

Under Rule 3A:10(c), "The court may direct that an accused be tried at one time for all offenses then pending against him, if justice does not require separate trials and . . . the offenses meet the requirements of Rule 3A:6(b)." "Justice often requires separate trials where highly prejudicial evidence of one of the crimes is not admissible in the trial of the other." *Brooks*, 73 Va. App. at 145 (quoting *Long v. Commonwealth*, 20 Va. App. 223, 226 (1995)). As for Rule 3A:6(b), it provides that "[t]wo or more offenses . . . may be charged in separate counts of an

indictment or information if the offenses are based on the same act or transaction, or on two or more acts or transactions that are connected." "To meet [Rule 3A:6(b)'s] 'connected' test, the crimes should be 'so intimately connected and blended with the main facts adduced in evidence, that they cannot be departed from with propriety.'" *Doss v. Commonwealth*, 59 Va. App. 435, 449 (2012) (quoting *Spence v. Commonwealth*, 12 Va. App. 1040, 1044 (1991)). The Court should therefore "look to whether the transactions were 'closely connected in time, place, and means of commission, all of which supports the use of a single trial.'" *Id.* (quoting *Yellardy v. Commonwealth*, 38 Va. App. 19, 24 (2002)).

Even if a trial court errs by joining offenses that do not meet the requirements of Rule 3A:10(c), however, "the error does not necessarily require reversal." *Cousett*, 71 Va. App. at 60. "Errors, defects, irregularities or variances that do not affect substantive rights do not constitute reversible error." Rule 3A:2. "Non-constitutional error is harmless '[w]hen it plainly appears from the record and evidence given at trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" *Cousett*, 71 Va. App. at 60-61 (alteration in original) (quoting *Purvis v. Commonwealth*, 31 Va. App. 298, 308 (2000)). And because "the purpose of the rule limiting joinder of trials is to prevent the harm caused by the introduction of otherwise *inadmissible* evidence of another crime," error in this context "is harmless if evidence related to each of the counts would have been admissible in a separate trial of any of the other counts." *Id.* at 61 (quoting *Purvis*, 31 Va. App. at 308).

Thus, the test for harmless error is whether evidence of the strangulations would be admissible at a trial on the arrest-related charges, and vice versa. Under Virginia Rule of Evidence 2:404(b), "evidence of other crimes, wrongs, or acts" is admissible "if the legitimate probative value of such proof outweighs its incidental prejudice" and "if it tends to prove any relevant fact pertaining to the offense charged, such as . . . motive, opportunity, intent,

- 7 -

preparation, plan, knowledge, identity, absence of a mistake, accident, or if they are part of a common scheme or plan."

Here, Gordon's attempted flight and resisting arrest are probative of her "consciousness of guilt" or "guilty knowledge" related to the strangulations. *See Jones v. Commonwealth*, 279 Va. 52, 57 (2010) ("[T]he term 'consciousness of guilt' generally is applied to affirmative acts of . . . flight immediately following the commission of a crime, which tend to show a person's guilty knowledge of, and participation in, a criminal act."). What is more, Gordon discussed the strangulation incidents with law-enforcement officers in the conversation immediately preceding her arrest and flight, pausing after being told that S.G. had reported being strangled. Gordon denied strangling S.G. but admitted to having "whooped" and "restrained" her. When told that S.G. had marks on her throat, Gordon held up her right arm, in a choke-hold position, while offering a dubious explanation, "yeah, that's probably from getting her to stop pulling on stuff." Thus, Gordon's statements and body language as captured in the body-camera footage were relevant and admissible on the strangulation charges. Similarly, to prove that Gordon bit Gibson and resisted arrest, the facts surrounding the strangulation incidents are probative of Gordon's motive—to escape arrest on serious charges. Because evidence of Gordon's crimes involving each set of charges was admissible in the prosecution of the other set, any error in denying separate trials was harmless under *Cousett*.

B. *The trial court did not err in denying Gordon's motion to suppress (Assignment of Error 2).*

Gordon argues that the evidence obtained following the officers' warrantless entry into her home should be suppressed. *See Jefferson v. Commonwealth*, 27 Va. App. 1, 14 (1998) ("Although the Fourth Amendment permits law enforcement officers to make warrantless arrests in public places upon probable cause, warrantless entries into a suspect's home in order to arrest a suspect violate the Fourth Amendment unless justified by exigent circumstances." (internal

citation omitted) (citing *Payton v. New York*, 445 U.S. 573, 575 (1980))). Gordon does not argue that the officers lacked probable cause, nor does she challenge the trial court's conclusion that she was in public before reentering her home. She argues only that the absence of exigent circumstances rendered the officers' warrantless entry unlawful.

"When challenging the denial of a motion to suppress evidence on appeal, the defendant bears the burden of establishing that reversible error occurred." *Street v. Commonwealth*, 75 Va. App. 298, 303-04 (2022) (quoting *Mason v. Commonwealth*, 291 Va. 362, 367 (2016)). "Appellate review of a suppression ruling involving a Fourth Amendment challenge presents a mixed question of law and fact." *Id.* at 304 (citation omitted). "This Court is 'bound by the trial court's findings of historical fact unless plainly wrong or without evidence to support them.' However, the Court reviews *de novo* the overarching question of whether a search or seizure violated the Fourth Amendment." *Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021) (citation omitted) (quoting *Williams v. Commonwealth*, 71 Va. App. 462, 475 (2020)). "[O]ur review includes evidence presented at both the suppression hearing and the trial." *Id.* (quoting *Williams*, 71 Va. App. at 475).

Because Gordon had been lawfully arrested by the time she reentered her home, the officers could follow her inside without a warrant. "An arrest requires *either* physical force . . . or . . . *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991). "[A]n arrest is effected by the *slightest* application of physical force, despite the arrestee's escape . . . ." *Id.* at 625 (emphasis added). Here, the trial court made a factual finding—based on its review of the body-camera footage—that the officers made physical contact with Gordon before she went back inside her camper. Although the video footage is shaky at the moment Gordon bolts inside and the officers reach for her, we cannot dispute the reasonableness of the trial court's interpretation of the video. "As factfinder, a trial court views

video and other evidence to determine what it believes happened; we, on appellate review, view video evidence not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the trial court did." *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022). Here, the officers "spoke words of arrest and actually touched [Gordon] for the stated purpose of arrest. Thus, at that moment, notwithstanding [Gordon]'s subsequent [resistance], the arrest was effected and [Gordon] was in custody." *Hall v. Commonwealth*, 280 Va. 566, 571 (2010). Virginia courts follow the "*per se* rule that once a suspect is placed under arrest, an officer is authorized in accompanying the arrestee wherever he goes." *Servis v. Commonwealth*, 6 Va. App. 507, 518-19 (1988) (citing *Washington v. Chrisman*, 455 U.S. 1, 7 (1982)). That includes following a defendant "into [his] home." *Conway v. Commonwealth*, 12 Va. App. 711, 718 (1991) (en banc).

In other words, after arresting Gordon outside her home, the officers properly followed her inside when she tried to escape. Thus, the trial court did not err in denying Gordon's suppression motion.

### C. The evidence sufficed to prove strangulation and assault and battery on a law-enforcement officer (Assignment of Error 3).

Gordon argues that the strangulation conviction cannot stand because the Commonwealth failed to prove that she impeded S.G.'s blood circulation or respiration. Gordon also challenges the assault-and-battery charge arising out of her attempted biting of Gibson, asserting that the body-camera video does not show her biting Gibson's vest.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a

reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

### 1. *Strangulation*

Under Code § 18.2-51.6, "[a]ny person who, without consent, impedes the blood circulation or respiration of another person by knowingly, intentionally, and unlawfully applying pressure to the neck of such person resulting in the wounding or bodily injury of such person is guilty of strangulation, a Class 6 felony."

The evidence sufficed to prove that Gordon impeded S.G.'s blood circulation or respiration. Ledger, the forensic nurse examiner, explained to the jury that it takes only four pounds of pressure to occlude the vein responsible for carrying blood from the brain to the heart. And when blood is obstructed, the victim may suffer symptoms like trouble breathing, vision changes, and dizziness. S.G. reported experiencing all of those symptoms, both to Ledger at the hospital and in her trial testimony.

The evidence of S.G.'s injuries also showed that her blood circulation and respiration were impeded. The jury saw photographs of the marks around S.G.'s neck and heard Ledger chronicle the strangulation-related injuries. The motorist and Spencer, too, reported seeing marks on S.G.'s neck. And Ledger's measurements of S.G.'s neck showed that her neck was swollen immediately following the second alleged strangulation. Although Gordon denied putting her hands around S.G.'s neck, the jury "was at liberty to discount [her] self-serving statements as little more than lying to 'conceal [her] guilt' and could treat such prevarications as 'affirmative evidence of guilt.'" *Coleman v. Commonwealth*, 52 Va. App. 19, 25 (2008) (first

- 11 -

quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 10 (2004); and then quoting *Wright v. West*, 505 U.S. 277, 296 (1992)).

In short, there was overwhelming evidence to support the strangulation finding.

### *2. Assault and Battery on a Law-Enforcement Officer*

Gordon failed to preserve her sufficiency argument on the charge of assault and battery on a law-enforcement officer. *See* Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling . . . ."). When Gordon moved to strike the evidence on the other charges, she conceded that the question of whether she bit Gibson was "essentially going to" depend on "who the [jurors] believe as to what happened . . . on that charge." She did not argue that the Commonwealth failed to carry its burden of proof. Accordingly, this argument is barred by Rule 5A:18.

### CONCLUSION

Having considered Gordon's assignments of error, we find none that supports disturbing her convictions.

*Affirmed.*