UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Fulton, Friedman and Chaney
Argued at Norfolk, Virginia


MICHAEL ALAN BUSH

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0682-22-1                      JUDGE VERNIDA R. CHANEY
                                                    DECEMBER 28, 2023
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF YORK COUNTY
Richard H. Rizk, Judge

Charles E. Haden for appellant.

Tanner M. Russo, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, Michael Alan Bush was convicted of first-degree murder, in

violation of Code § 18.2-32.  Bush contends on appeal that the trial court erred in (1) denying his

motion to suppress statements made to police while hospitalized; (2) denying his motion to strike

the Commonwealth's evidence as insufficient to prove first-degree murder; and (3) rejecting his

proposed jury instruction on the absence of a duty to retreat when attacked in the curtilage of

one's home.  For the following reasons, this Court affirms the trial court's judgment.

                                    BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial."  *Poole v. Commonwealth*,

73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

A.  The Murder of Greg Lee Mullins

On October 13, 2018, police dispatch reported a stabbing at Colonial Trailer Park in York County, where Bush resided.  The stabbing victim, Greg Lee Mullins, was Bush's friend and neighbor.  Bush and Mullins had a history of physically fighting each other while intoxicated.

Around 12:30 a.m., a mutual friend and neighbor of Bush and Mullins, Tammy Allen, joined Bush in drinking whiskey on the porch of Bush's trailer.  Bush had been drinking heavily that day after attending his father's funeral and burial.  Allen testified that Bush was "pretty drunk" that night.  Around 12:45 a.m., Mullins called Allen and sounded drunk.

While Bush and Allen were drinking on the porch, Bush's adult son, Dyllon, was asleep in Bush's bedroom.  Dyllon and his girlfriend were staying with Bush that night.

Around 1:30 a.m., Mullins drove past Bush's trailer in "a white truck with giant tires." The truck's owner, Chris Reynolds, was in the passenger seat.  Mullins and Reynolds were both very drunk.  After driving past Bush's trailer, Mullins backed up into two vehicles parked in front of Bush's trailer.  Mullins hit Dyllon's car and Bush's girlfriend's truck, which Bush had borrowed.

After hitting the vehicles in front of Bush's trailer, Mullins got out of the truck saying, "I'm sorry, I'm sorry, it's okay, I'll take care of it, I'll take care of it."  Bush was visibly angry and yelled at Mullins.  After Mullins apologized and said he would take care of it, Bush "uppercut" Mullins. Then Mullins tore off his shirt, and they began fighting.  During the fight, Mullins kicked Bush in the head.  Reynolds never kicked Bush.

As they wrestled on the ground, Mullins yelled, "get off me, dude, get off me, I said I would take care of it."  Then Mullins bit Bush on his face.  Reynolds pulled Bush off Mullins by the pant leg. Then Bush stood up and screamed, "he bit me," "he bit my eye," as blood gushed from his eyebrow.  Bush had a wide, open, bleeding laceration above his eyebrow, swelling

above his eyelid, bleeding from his ear, and bruising behind his ear. Bush's injuries required stitches.

Bush ran to his trailer screaming, "he bit me, he bit me." Dyllon saw that Bush was "bleeding above his eye, and it was going down his face." After a few minutes, Bush grabbed a knife and told Dyllon, "I'm going to stab that motherfucker," and quickly went outside.

Bush reapproached Mullins, and they fought again. Bush held the knife overhead, lunged forward, and stabbed Mullins in the chest several times. Mullins screamed, "he stabbed me, he stabbed me." Mullins walked across the street and fell to the ground. Allen and another neighbor used Mullins's shirt to apply pressure to stop the bleeding from Mullins's chest. Only 15 minutes elapsed from the time Mullins drove into two vehicles near Bush's trailer and the time Bush stabbed Mullins.

After stabbing Mullins, Bush walked away with the knife in hand and returned to his trailer. Dyllon told Bush "that he would go to prison now because he killed somebody." Bush responded, addressing Dyllon and Dyllon's girlfriend, that he was protecting them. At Allen's direction, Dyllon called 911. Dyllon reported, "Somebody bit my dad and my dad apparently stabbed him."

After the stabbing, Mullins suffered traumatic cardiac arrest. Paramedics transported Mullins to the hospital at 3:42 a.m. Mullins had 15 sharp-force injuries and died from the stab wounds on his chest.

### B. Bush's Statements to Police

On the night of the stabbing, the police arrested Bush at his trailer. Bush had blood on his hands and clothing. The police observed that Bush had an injury to his right eye that "appeared to be . . . a bite or a cut . . . [with] obvious swelling to that eye." He was shaking and had a strong odor of alcohol on him. He "vacillated between being very calm with [the police]

and being very distraught over [his father's death]." Bush cooperated with the police and pointed out the knife he used to stab Mullins. The police recovered the knife from Bush's porch.

The police transported Bush to the hospital and obtained a warrant to draw his blood. Bush's blood alcohol level was .08% by weight by volume, and his blood contained a small amount of THC. Bush informed the police that he did not drink much alcohol that day, and only "had a pint since noon." Bush added that he "took a couple shots" of whiskey before his father's burial, drank about four or five more shots with dinner, and drank two or three more shots before the fight with Mullins. Bush concluded that he drank 12 shots of whiskey throughout the day. Investigator Micket testified that Bush "did not seem to be impaired" by alcohol during their conversation in the hospital.

Deputy Hall questioned Bush while Bush was handcuffed to a hospital bed with a brace on his neck. Deputy Hall's body camera (bodycam) recorded their conversation. Bush told Deputy Hall that he had been hit in the head three times and was trying to remember the night's events.

Bush told Deputy Hall that he was sitting on his porch with his roommate that night when Mullins side-swiped and dented his girlfriend's truck and his son's new car. Bush said, "The other dude got out and came hauling ass at me." Bush added, "The previous times we've been in an argument, he's coming at me and he's gonna try to whoop my ass." Bush stated, "I told him I had a knife."

During the conversation with Deputy Hall, Bush said, "I should shut the fuck up until I talk to a lawyer." Deputy Hall told Bush that he was just trying to figure out the order of events. Deputy Hall then said, "That's okay. You don't have to talk to me." Then Deputy Hall read the *Miranda* warnings aloud to Bush and asked, "Do you understand your rights?"[1] Bush replied,

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

"Yes, sir." Then Deputy Hall said, "There's going to be investigators coming here. I'm just letting you know. You don't have to answer anything else further from this point. I was just trying to get the facts as to how that happened on your head." Bush stated, "I think I'm going to say something stupid." Bush added, "My brother has told me, 'Don't say shit.' He's a police officer." Deputy Hall responded, "Okay. Alright. I'm not going to ask you anything else." Deputy Hall added, "Investigators are going to be here soon. They're going to ask—they're going to try to talk to you. I'll let them know that I read you *Miranda* just now and I'll let them know what information you advised us when we first put you in custody."

After Deputy Hall questioned Bush, Investigator Micket arrived at the hospital to question Bush. Investigator Micket's bodycam recorded their conversation. Bush was still handcuffed to a hospital bed with a brace on his neck. Two uniformed officers stood guard in the room. After Investigator Micket introduced himself and reminded Bush of their prior interactions, Bush said, "I'm in a world of shit."

Investigator Micket told Bush, "I'd love to sit down and talk to you, . . . but I understand that the deputy over here read you your rights and stuff like that, and you said you wanted an attorney, okay? You're well within your rights, that's completely up to you." Investigator Micket continued, "Basically, I was going to come and read you your rights again. I mean, obviously, you're handcuffed, you're not free to go right now, but I'd like to sit down and try to figure out what the heck happened with this whole thing." Bush replied, "I would like to talk to you."

Investigator Micket read Bush the *Miranda* warnings and asked Bush if he understood his rights. Bush replied, "Yes." Bush said he would speak to the investigator if he could sit up. At that time, they were waiting for Bush's doctor to rule out a major neck injury before removing the brace from his neck. While waiting, Investigator Micket questioned Bush about his

background information. Then a nurse removed the neck brace and adjusted the hospital bed to prop Bush up into a seated position.

After Bush sat up in the hospital bed, he confirmed that he was willing to talk to the investigator. Bush told Investigator Micket that he was depressed after returning from his father's funeral that night. Bush reported that while he and his roommate were on the porch, Mullins backed his van out of his driveway, sped down the street, and hit his girlfriend's truck and his son's new car. Bush explained that Mullins just "clipped" the truck at first, but "then he backed up and plowed into it and hit [his] son's car."

After the vehicle collisions, Bush reportedly yelled at Mullins, "What the fuck are you doing, you fucking dumbass?" Bush asserted that he never made an aggressive move toward Mullins. Bush stated that Mullins angrily approached him. Then they began fighting and hit the ground. Bush said that this was the second time in three weeks, and the third time in three months, that they had fought. Bush said that Reynolds also came out of the van, and they "double-teamed" him.[2]

When recounting the fight with Mullins, Bush initially reported, "[Mullins] got me on my back and he bit me in the fucking face." But when Investigator Micket asked Bush to confirm that he was on his back when Mullins bit him, Bush replied, "Matter of fact, I was on top. I was on top. Then he bit me in the face. I think. I don't know." Bush claimed that Mullins bit his eye, causing significant bleeding. Bush stated that while he was on top of Mullins trying to hold him down, Reynolds kicked him in the back and head. When Bush rolled off Mullins and stood up, he struggled to see through the blood covering his eyes. He returned to his trailer and screamed for his son to call the police.

---

[2] Bush stated that he did not know Mullins's companion, but he was apparently referring to Reynolds.

Bush further reported that after he returned to his trailer, he grabbed a filet knife that he kept for self-protection. Bush stated, "I went back out in the street" and confronted Mullins. When asked for details about the events, Bush said, "It's a blur." Bush claimed that Mullins exited his van and tackled him.[3] Then both Mullins and Reynolds reportedly kicked Bush repeatedly. Bush stated that he "was trying to whoop Mullins's ass." Bush then "stuck him" with the knife. Bush claimed that he then fell and momentarily passed out. He reportedly woke up as Reynolds was dragging him by his ankle, with Mullins on top of him. Then Bush stabbed Mullins again. Bush reportedly swung the knife repeatedly while he was being kicked in the head. When asked how many times he stabbed Mullins, Bush replied, "I lunged at him three or four times." Then Mullins reportedly fell off to the side of Bush. At that point, Reynolds reportedly dropped Bush's leg and ran away. Bush "stumbled up" as Mullins also got up, and Bush chased Reynolds for a few steps. Bush then turned and saw Mullins stumble a few steps and fall. Bush then looked down at the knife in his hand and said, "What the fuck have I done?"

After recounting the events surrounding the stabbing, Bush tearfully remarked, "I put a knife inside of another man. That is not cool. That is not cool at all." During the conversation with Investigator Micket, Bush repeatedly inquired about Mullins's condition.

When Investigator Micket inquired whether the fight with Mullins took place in the street, Bush nodded and said, "Yeah." Bush added, "it was right there in front of where he crashed into my girlfriend's truck." Investigator Micket further inquired whether they were wrestling on the ground in the roadway. Bush nodded affirmatively and replied that it happened "right there beside [his] . . . truck."

---

[3] At first, Bush stated that Mullins exited a truck when he reapproached him in the street. When asked for clarification, Bush stated that Mullins exited a van.

## C. Proceedings in the Trial Court

### 1. Motion to Suppress

Bush moved to suppress the statements he made to police while he was hospitalized. Following a hearing in September 2021, the trial court denied Bush's suppression motion. The trial court found that Bush did not clearly, unequivocally, unambiguously invoke his right to counsel but was "merely offering thoughts" when he stated that he should stop talking before speaking to a lawyer. The trial court noted that Deputy Hall's mistaken conclusion that Bush had invoked his right to counsel was not binding on the court.

The trial court further found that, under the totality of the circumstances, Bush's will was not overborne by law enforcement and his statements to police were voluntary. Specifically, the court found that Bush's injuries and intoxication were not such that he could not voluntarily consent to speak with Investigator Micket. The trial court noted that Bush was "oriented to person, place, and time" according to his medical records. The trial court found "there was absolutely no slurring[] [and] [Bush] was able to move without being unsteady." The trial court also found that Bush had prior dealings with law enforcement, including Investigator Micket. The trial court further found that Bush "was always responsive to the questions of the medics and officers and spoke without any hesitancy, and, at times, without even being questioned by the law enforcement." Upon finding that Bush's statements to the police were voluntary, the trial court denied Bush's suppression motion.

### 2. Motion to Strike

Bush was tried before a jury in September 2021. After the Commonwealth rested its case-in-chief, Bush moved to strike the evidence. Bush contended that the evidence was insufficient to prove first-degree murder. He argued that given his blood alcohol level and loss of consciousness, "there's no way a reasonable jury can find that the decedent's death was

caused by a willful, deliberate and premeditated act with malice aforethought." Bush argued that the malice element was not supported by the evidence given Bush's expressed concern for Mullins after the stabbing. The trial court overruled Bush's motion to strike.

### 3. Bush's Trial Testimony

Bush testified at trial as the only defense witness. Bush testified that Mullins drove by in a van and hit his truck when he was on his deck drinking with Tammy Allen. He stated that he drank two and half pints of alcohol that day. Bush testified that at that time, he had problems with his vision "because [he] was lit, and [he] had just had retinal reattachment surgery." As Tammy ran away from the scene, Bush went "in the street" to inspect the damage to his truck.

Bush testified that he was "going ballistic" screaming at Mullins when Mullins and his friend, Reynolds, got out of the van. Mullins removed his shirt and tackled Bush. They wrestled on the side of Bush's girlfriend's truck, and Mullins got on top of Bush. At some point, Reynolds kicked Bush in the back. While Mullins held Bush down, he pressed his thumbs on Bush's eyes and bit Bush's right eye. Bush's "eye filled up with blood," and his "whole face [was] covered in blood."

Bush threw Mullins off him and ran to his house, screaming for his son to call the police. As Bush held a rag to his bleeding face, he heard another crash outside. When Bush looked outside, he saw Reynolds's truck pulling away from his truck.

Bush was "scared to death" that Mullins was so drunk and "coked out" that he would come into Bush's house and harm him, his son, and his son's girlfriend. As a defensive measure, Bush took a knife with him when he went outside to inspect the damage to his truck. As Bush was looking at his truck with the knife in hand, Mullins drove back and stopped in front of Bush's truck.

Bush moved toward the front of his truck, and both Mullins and Reynolds exited their vehicle. Bush yelled at Mullins, "[y]ou're going to jail this time." Then Mullins tackled Bush to the ground in a grassy area in Bush's yard near his garbage cans. They hit the ground with Mullins on top of Bush, and Mullins "got stuck with the knife" the first time. Mullins held Bush's head as Reynolds repeatedly hit Bush in the back of the head. At some point, Reynolds kicked Bush. Bush repeatedly hit Mullins with the knife as he punched Mullins to get him off him. Bush stated that he "didn't know [Mullins] was getting cut every time." Bush briefly lost consciousness. Then he was "dragged out in the middle of the road" by his legs.

When Bush stood up, he had no peripheral vision and had ringing in his ears. He saw Mullins and Reynolds standing together, with Reynolds trying to hold Mullins up. When Reynolds saw Bush standing, Reynolds dropped Mullins and ran away. Mullins was on one knee as Bush walked past him and returned to his house "in a daze."

Bush denied saying that he was going to stab Mullins before he left his house with the knife. Bush also denied starting the fight and "uppercutting" Mullins. When asked about discrepancies between Bush's statements to police and his testimony, Bush testified that he did not accurately recall the events until he sobered up in jail, after he spoke with police.

*4. Renewed Motion to Strike*

After Bush rested his case, he renewed his motion to strike. Bush argued that in light of his blood alcohol content, loss of consciousness, and self-defense claims, in addition to the credibility of witnesses, a reasonable jury cannot find first-degree murder, including the elements of willfulness, deliberation, premeditation, and malice. The trial court noted that the jurors "are the judges of the facts and the credibility of the witnesses," and overruled Bush's motion to strike.

### 5. Refused Jury Instruction Regarding the Absence of Duty to Retreat

Bush proposed a jury instruction stating, "a person who is attacked in his home has no duty to retreat before resorting to deadly force." Bush's proposed instruction further stated, "If [Bush] was an occupant of the dwelling in which he was attacked, he was entitled to stand his ground and repel an attack in his own dwelling or the immediate area surrounding the dwelling, even if he could have retreated with safety."[4]

The trial court rejected Bush's proposed instruction, concluding that it misstated the law, could confuse the jury when read with the other self-defense instructions, and was unsupported by the evidence. The trial court found that the relevant events occurred outside, "removed from the porch." The court ruled that the Castle Doctrine's exception to the duty to retreat does not extend to the area surrounding a defendant's dwelling. Upon finding that "[t]here is no scintilla of evidence that supports that this occurred inside or inside any dwelling on the property," the trial court refused the instruction.

### 6. Jury Verdict and Sentencing

The jury convicted Bush of first-degree murder as charged in the indictment. The trial court sentenced Bush to incarceration for 40 years with 5 years suspended. This appeal followed.

---

[4] Bush's refused instruction regarding the "Castle Doctrine," in its entirety, states:

> One of the exceptions to the general rule that Michael Alan Bush has a duty to make a reasonable effort to retreat before using deadly force is that a person who is attacked in his home has no duty to retreat before resorting to deadly force. If Michael Alan Bush was an occupant of the dwelling in which he was attacked, he was entitled to stand his ground and repel an attack in his own dwelling or the immediate area surrounding the dwelling, even if he could have retreated with safety. Nonetheless, Michael Alan Bush still must have abided by the other requirements of the law of self-defense, as I have instructed you.

ANALYSIS

I. The trial court did not err in denying Bush's motion to suppress.

Bush contends that the trial court erred in denying his motion to suppress his statements to Investigator Micket while he was hospitalized. He contends that Investigator Micket violated his Fifth Amendment *Miranda* rights by interrogating him after he "plainly told [Deputy] Hall . . . that he wanted to speak to a lawyer." Op. Br. 32. Bush also asserts that Investigator Micket "overbor[e] [his] will" in eliciting his statements, rendering his statements involuntary. For the following reasons, this Court disagrees with Bush and finds no Fifth Amendment violation.

A. Standard of Review

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. On appeal of an order denying a motion to suppress evidence, this Court "determine[s] whether the accused has met his burden to show that the trial court's ruling, when the evidence is viewed in the light most favorable to the Commonwealth, was reversible error." *Carter v. Commonwealth*, ___ Va. App. ___ (Dec. 28, 2023) (quoting *Merid v. Commonwealth*, 72 Va. App. 104, 108 (2020)). "[W]hether a defendant clearly requested an attorney during a custodial interrogation is a mixed question of law and fact." *Commonwealth v. Redmond*, 264 Va. 321, 326 (2002). We apply the constitutional standard to the facts and make a de novo legal determination whether the defendant invoked his right to counsel. *Id.* But this Court is "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them." *Carter*, ___ Va. App. at ___ (quoting *Merid*, 72 Va. App. at 109).

"The test for determining voluntariness is whether the statement was the 'product of an essentially free and unconstrained choice by its maker,' or 'induced by such duress or coercion that the suspect's will has been overborne and his capacity for self-determination critically

- 12 -

impaired.'" *Secret v. Commonwealth*, 296 Va. 204, 226 (2018) (citation omitted) (quoting *United States v. Locklear*, 829 F.2d 1314, 1317 (1987)). "For purposes of a Fifth Amendment self-incrimination challenge, '[v]oluntariness is a question of law, subject to independent appellate review.'" *Id.* at 225 (alteration in original) (quoting *Avent v. Commonwealth*, 279 Va. 175, 195 (2010)). "In determining whether a defendant's will was overborne by police coercion, 'courts look to the totality of all the surrounding circumstances,' including the defendant's background and experience and the conduct of the police." *Id.* at 226 (citations omitted) (quoting *Avent*, 279 Va. at 195).

### B. The police did not violate Bush's *Miranda* rights.

The privilege against self-incrimination extends to individuals subjected to custodial interrogation by the police. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). Before law enforcement officers may question a suspect who is in custody, the suspect

> must be warned . . . that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479. Statements obtained during a custodial interrogation without *Miranda* warnings "generally will be subject to exclusion for most proof purposes in a criminal trial." *Anderson v. Commonwealth*, 279 Va. 85, 90-91 (2010) (quoting *Dixon v. Commonwealth*, 270 Va. 34, 39 (2005)).

Officers must suspend questioning if a suspect has clearly asserted his right to counsel. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). "[O]nce an accused expresses a desire to exercise his right to counsel, authorities may not further interrogate the accused until counsel is present unless the accused initiates further conversation or exchanges with the authorities." *Midkiff v. Commonwealth*, 250 Va. 262, 266 (1995) (citing *Edwards*, 451 U.S. at 484-85).

- 13 -

"To invoke the protections provided by *Miranda* and *Edwards* an accused must clearly and unambiguously assert his right to counsel." *Stevens v. Commonwealth*, 283 Va. 296, 303 (2012); *see also Zektaw v. Commonwealth*, 278 Va. 127, 136 (2009) ("[T]he invocation of the right to counsel must be clear, unambiguous, and unequivocal."). "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis v. United States*, 512 U.S. 452, 461-62 (1994). A statement that is "merely an inquiry requesting a clarification or affirmation" of rights or that expresses "an uncertainty about the wisdom of continuing the interrogation without consulting another person" is not an invocation of the right to counsel. *Commonwealth v. Hilliard*, 270 Va. 42, 51-52 (2005).

In arguing that he invoked his right to counsel, Bush seems to rely on his statements that he "should shut the fuck up until [he] talk[ed] to a lawyer" and that his "brother ha[d] told [him], 'don't say shit until you get a lawyer.'" Bush's statements plainly fall under those types of statements characterized in *Hilliard* as expressing "an uncertainty about the wisdom of continuing the interrogation." *Hilliard*, 270 Va. at 52. In *Hilliard*, our Supreme Court held that a suspect did not unequivocally invoke his right to counsel when he asked the police if he could "have someone else present, . . . like a lawyer," and later told the police: "I would like to have somebody else in here because I may say something I don't even know what I am saying, and it might f[] me up, might jam me up in some incidents, and I don't want that to happen, man." *Hilliard*, 270 Va. at 46, 51 (second alteration in original). Similarly, in *Midkiff*, our Supreme Court held that a suspect did not unequivocally invoke his right to counsel when he stated, "I'll be honest with you, I'm scared to say anything without talking to a lawyer." *Midkiff*, 250 Va. at 265-66; *see also Bunch v. Commonwealth*, 225 Va. 423, 430, 433 (1983) (defendant's statement that "he felt like he might want to talk to a lawyer" was "couched in ambiguous terms to the

effect that he *might* want to talk to a lawyer"). Similarly, Bush's statement about what he "should" do was not an unequivocal request for a lawyer that required the police to cease questioning.[5]

### C. Bush's statements to the police were voluntary.

Considering the totality of the circumstances, this Court holds that Bush's statements to the police were voluntary and not the result of police coercion. The trial court found that Bush had prior experience with law enforcement, including prior encounters with Investigator Micket. The trial court also found that during his conversations with police, Bush spoke without any hesitancy, and, at times, without being questioned. The record shows that both Deputy Hall and Investigator Micket informed Bush multiple times that he was not required to answer their questions and had a right not to speak with them. The record also shows that Bush verbally acknowledged his understanding that he was free to decline to answer, and he expressly told Investigator Micket, "I would like to talk to you." Given the trial court's factual determinations, which are supported by the record and not plainly wrong, and considering the totality of the surrounding circumstances, we conclude that Bush's will was not overborne by police coercion when he made statements to the police.

This Court also holds that the trial court did not err in finding that Bush's injuries and intoxication did not render him incapable of voluntarily consenting to converse with the police. Investigator Micket testified, without objection, that Bush "did not seem to be impaired" by alcohol during their conversation in the hospital. The trial court found that in speaking with the police (i) Bush's speech was not slurred, (ii) his answers were responsive to the questions asked,

---

[5] This Court is not bound by—and rejects—Deputy Hall's legal opinion that Bush had invoked his right to counsel. "[W]hether an accused actually invoked his right to counsel is a purely objective inquiry." *Hilliard*, 270 Va. at 50. An officer's "subjective understanding is irrelevant." *Id.*

(iii) he was "able to move without being unsteady," and (iv) he frequently volunteered statements without being questioned. The trial court also noted that Bush was "oriented to person, place, and time" according to his medical records. Because the evidence supports the trial court's findings, we conclude the trial court did not err in finding that Bush had the capacity to voluntarily consent to converse with the police, despite his injuries and intoxication.

Therefore, the trial court did not err in denying Bush's suppression motion.

## II. The trial court did not err in denying Bush's motion to strike the evidence.

### A. Standard of Review

Bush contends that evidence is insufficient to sustain his conviction for first-degree murder. When an appellant challenges the sufficiency of the evidence to support a criminal conviction, this Court "reviews the evidence in the light most favorable to the Commonwealth, as the prevailing party at trial, and considers all inferences fairly deducible from that evidence." *Commonwealth v. Herring*, 288 Va. 59, 66 (2014) (quoting *Allen v. Commonwealth*, 287 Va. 68, 72 (2014)). At issue on appeal is "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). The circuit court's judgment will be affirmed "unless it is plainly wrong or without evidence to support it." *Sarka v. Commonwealth*, 73 Va. App. 56, 62 (2021); *see also* Code § 8.01-680.

### B. Sufficient Evidence of Premeditation

To establish the essential elements of first-degree murder, the Commonwealth must prove that Bush committed a "willful, deliberate, and premeditated killing." Code § 18.2-32. Virginia law recognizes that "voluntary intoxication can negate the premeditation required for first-degree murder." *Proctor v. Commonwealth*, 40 Va. App. 233, 245 (2003). Bush contends that the evidence is insufficient to sustain his conviction for first-degree murder because his "extreme

voluntary intoxication rendered him incapable of the premeditation necessary for a conviction of first-degree murder." Op. Br. 39. We disagree.

"Whether [a defendant's] voluntary intoxication rose to such a level that it negated his ability to premeditate the crime was a factual determination for the jury." *Proctor*, 40 Va. App. at 245. Considering the totality of the evidence, this Court concludes that a rational fact-finder could find that Bush was not so intoxicated that he was incapable of premeditation when he killed Mullins. The video recordings of Bush on the night of the stabbing support findings that Bush was lucid and mentally alert that night. In one recording, Bush stated that he did not drink much alcohol that day, and only "had a pint since noon." The jurors also heard evidence that Bush "drank every day" and that frequent alcohol users have more tolerance for alcohol. Because the jury's finding of premeditation is supported by the evidence and not plainly wrong, the trial court did not err in denying Bush's motion to strike.

### C. The evidence does not establish "self-defense as a matter of law."

"Self-defense is an affirmative defense which the accused must prove by introducing sufficient evidence to raise a reasonable doubt about his guilt." *Smith v. Commonwealth*, 17 Va. App. 68, 71 (1993) (citing *McGhee v. Commonwealth*, 219 Va. 560, 562 (1978)). "To establish a claim of self-defense, a defendant must show that he reasonably feared death or serious bodily harm at the hands of his victim." *Hines v. Commonwealth*, 292 Va. 674, 679 (2016). "Whether the danger is reasonably apparent is judged from the viewpoint of the defendant at the time of the incident." *Id.* "The defendant must also show that he was in imminent danger of harm, that is, a showing of an overt act or other circumstance that affords an immediate threat to safety." *Id.* "Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact." *Smith*, 17 Va. App. at 71 (citing *Yarborough v. Commonwealth*, 217 Va. 971, 979 (1977)).

This Court has recognized that "undisputed facts may establish self-defense as a matter of law." *Lynn v. Commonwealth*, 27 Va. App. 336, 353 (1998) (citing *Hensley v. Commonwealth*, 161 Va. 1033 (1933)), *aff'd*, 257 Va. 239 (1999). In *Hensley*, our Supreme Court reversed the defendant's conviction for involuntary manslaughter where the defendant claimed self-defense and the evidence overwhelmingly established that the alleged victim assaulted the defendant without provocation and was stabbing the defendant with a knife when the defendant shot him. *Hensley*, 161 Va. at 1035-36. In contrast to the facts in *Hensley*—where the uncontradicted evidence established that the defendant responded to an unprovoked attack—the evidence here supports a finding that Bush did not stab Mullins in self-defense.

Based on the evidence, a rational fact-finder could find that Bush (i) initiated a physical fight with Mullins when he "uppercut" Mullins after the vehicle collision, (ii) obtained a knife from his residence after Mullins bit him during the fight, (iii) declared "I'm going to stab that motherfucker," (iv) quickly went outside and reapproached Mullins, (v) held the knife overhead, lunged forward, and stabbed Mullins in the chest several times. Because a rational juror could find that Bush reapproached and stabbed Mullins when Mullins posed no imminent threat to Bush, this Court cannot conclude as a matter of law that Bush stabbed and killed Mullins in self-defense. Since the evidence supports the jury's finding that Bush did not act in self-defense, the evidence is sufficient to sustain Bush's conviction for first-degree murder.

III. The trial court did not err in refusing Bush's jury instruction regarding the absence of a duty to retreat when attacked in one's home or its curtilage.

A. Standard of Review

Bush contends that the trial court erred in refusing to instruct the jury that a defendant has no duty to retreat before resorting to deadly force when attacked in his dwelling or in the curtilage of his dwelling. An appellate court "review[s] jury instructions to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises."

- 18 -

*Nottingham v. Commonwealth*, 73 Va. App. 221, 228 (2021) (alteration in original) (quoting *Watson v. Commonwealth*, 298 Va. 197, 207 (2019)). "Whether to give or deny jury instructions 'rest[s] in the sound discretion of the trial court.'" *Id.* (alteration in original) (quoting *Hilton v. Commonwealth*, 293 Va. 293, 302 (2017)). "However, this Court reviews *de novo* whether an instruction 'accurately states the relevant law.'" *Id.* (quoting *Ducharme v. Commonwealth*, 70 Va. App. 668, 674 (2019)).

"When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Williams v. Commonwealth*, 64 Va. App. 240, 244 (2015) (quoting *Commonwealth v. Vaughn*, 263 Va. 31, 33 (2002)). "[T]he evidence asserted in support of such an instruction 'must amount to more than a scintilla.'" *Buchanan v. Commonwealth*, 238 Va. 389, 409 (1989) (quoting *Justus v. Commonwealth*, 222 Va. 667, 678 (1981)). "'If a proffered instruction [on the defendant's theory of defense] finds any support in credible evidence,' however, 'its refusal is reversible error.'" *King v. Commonwealth*, 64 Va. App. 580, 587 (2015) (quoting *McClung v. Commonwealth*, 215 Va. 654, 657 (1975)).

B. <u>Bush's argument in support of the refused instruction is fatally undeveloped.</u>

The Commonwealth contends that Bush's argument on appeal is fatally undeveloped because he advances no argument in support of his contention that he was attacked in the curtilage of his home. This Court agrees with the Commonwealth.

A person attacked in his home "has the right to use whatever force necessary to repel the aggressor." *Hines*, 292 Va. at 679. "One in his own curtilage, who is free from fault in bringing on the combat, when attacked by another, has the same right of conduct, without any retreat." *Fortune v. Commonwealth*, 133 Va. 669, 686 (1922).

On appeal, Bush asserts that Mullins attacked him "just outside [his] home *but presumably within its curtilage*." Op. Br. 51 (emphasis added). "[W]hether a particular place is within the curtilage of the home is determined on a case-by-case basis," analyzing factors such as:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put and the steps taken by the resident to protect the area from observation by people passing by.

*Jefferson v. Commonwealth*, 27 Va. App. 1, 16-17 (1998) (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)). Bush provides no analysis of such factors and no explanation as to why the place of the attack constitutes curtilage. Rather, Bush merely *presumes*, based on no supporting argument, that Mullins attacked him in the curtilage of his home. *See* Rule 5A:20(e) (requiring *argument* relating to each assignment of error). Bush's undeveloped argument does not support a conclusion that the refused instruction was supported by more than a scintilla of evidence. Therefore, this Court finds no error in the trial court's refusal to give Bush's proposed instruction.

## CONCLUSION

For the foregoing reasons, this Court affirms the trial court's judgment.

*Affirmed*.