COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Elder and Overton
Argued at Richmond, Virginia


KENNETH O'NEAL JEFFERSON
                                          OPINION BY
v.        Record No. 0716-97-2      JUDGE LARRY G. ELDER
                                         MARCH 31, 1998
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF HENRICO COUNTY
                  James E. Kulp, Judge

          Steven D. Benjamin (Betty Layne DesPortes;
          Benjamin & DesPortes, on briefs), for
          appellant.

          Marla Graff Decker, Assistant Attorney
          General (Richard Cullen, Attorney General, on
          brief), for appellee.


     Kenneth O'Neal Jefferson (appellant) appeals his conviction

of possession of cocaine in violation of Code § 18.2-250.  He

contends the trial court erred when it denied his motion to

suppress (1) evidence obtained during a search of his person on

the night of his arrest and (2) an incriminating statement he

made to police shortly after his arrest.  For the reasons that

follow, we reverse and remand.

                              I.

                            FACTS

     At about 6:00 p.m. on July 25, 1996, Officer Jerome D. Hoyt

of the Henrico County Police Department received information from

a known informant that three people were selling cocaine "at the

corner of Second and Virginia" near 101 North Virginia Avenue.

The informant identified one of the three sellers as "Kenny 'Boo'

Jefferson" and described him as

> a black male . . . about five ten or five
> eleven inches tall, thin build, short cropped
> hair, had big eyes, two gold teeth, wearing a
> gr[a]y shirt, long blue jeans, and a gold
> chain around his neck.

The informant told Officer Hoyt that he had seen "Kenny 'Boo' Jefferson" exchange money for "actual crack cocaine" several times.  Officer Hoyt had known this informant for about a month after arresting him for a misdemeanor charge, which was still pending.  The informant was seeking to help himself on the misdemeanor charge by cooperating with the police.

After completing his phone call with the informant, Officer Hoyt called a second known informant and asked him to "go by [101 North Virginia Avenue] to see what was going on."  The second informant called Officer Hoyt a little after 6:30 p.m. and told him that he saw "Kenny 'Boo'" and two other individuals standing on the corner of Second and Virginia in front of 101 North Virginia Avenue.  The second informant stated that these three individuals had "cocaine on their person and for sale" and that he witnessed "Kenny 'Boo'" complete at least one sale of crack cocaine.  The second informant's description of "Kenny 'Boo'" matched the description of "Kenny 'Boo' Jefferson" given by the first informant.  Officer Hoyt had known the second informant for "approximately three or four months."  The second informant had a pending traffic charge against him that was punishable by incarceration and was cooperating with the police in several

2

matters in order to obtain leniency in the prosecution against him. Officer Hoyt had worked with the second informant "maybe a dozen times" and information provided by this informant had led to several arrests but no actual convictions as of July 25.

Based on the information provided by the two informants, Officer Hoyt's supervisor initiated an operation to locate the three individuals who were purportedly selling cocaine in front of 101 North Virginia Avenue. The police department assembled a team that included both "strike force" officers and uniformed officers. Prior to leaving the police department, Officer Hoyt conveyed the information provided by the informants to the officers involved in the operation, which included Officer L. D. Harpster. The police did not obtain either arrest warrants for the three individuals spotted at the corner of Second and Virginia or a search warrant for the house at 101 North Virginia Avenue.

Officer Harpster, Officer Hoyt, and the other officers involved in the operation arrived at the corner of Second and Virginia at 10:05 p.m. Officer Harpster testified that, by the time he exited his vehicle, several officers had already proceeded to the back of the house at 101 North Virginia Avenue. Officer Harpster then heard some of these officers "yelling," and he walked to the back of the house to investigate this "commotion."

When the officer arrived, appellant was inside the house at

101 North Virginia Avenue, which was his residence. Appellant heard a "commotion" from outside and walked to his back door. When appellant opened his back door, he saw "a whole bunch of police outside [his] house . . . in [the] back yard."

At about this time, Officer Harpster saw appellant and realized that he matched the description of "Kenny 'Boo' Jefferson" given by Officer Hoyt. Appellant was standing outside of the house "right in front" of the back door. Officer Harpster approached appellant, "put him on the ground[,] . . . put handcuffs on him and took him into custody." The record does not indicate whether appellant had moved from his location by his back door prior to being taken into custody by Officer Harpster. Although he had "no reason" to suspect that appellant was armed, Officer Harpster patted down appellant for weapons. The pat-down, which the record established was not a "full" search of appellant's person, yielded a "small bottle of liquor" but no incriminating evidence. Appellant later testified that, at this point, Officer Harpster told him he was under arrest. Officer Harpster later testified that he made no such statement to appellant.

Officer Hoyt approached appellant following the pat-down by Officer Harpster. Officer Hoyt told appellant that the police had received information that he was selling drugs and asked appellant, "Do you mind if I search you for drugs?" Appellant replied, "You might as well, because he's already done it."

4

Officer Hoyt searched appellant and retrieved .9 of a gram of crack cocaine and $158 in cash from appellant's "watch pocket." After seizing the cocaine and cash from appellant's person, Officer Hoyt told appellant he was under arrest.  Appellant was placed in the custody of Officer Akita Brown, who transported appellant to "Dabbs House."  At about 11:05 p.m., Officer Hoyt arrived at Dabbs House and informed appellant of his Miranda rights.  Appellant signed a "rights waiver form" and made an incriminating statement to the police.

Appellant was charged with possessing cocaine with intent to distribute in violation of Code § 18.2-248.  Prior to his trial, appellant moved the trial court to suppress the cocaine and cash seized by Officer Hoyt as well as his incriminating statement. Following a hearing, the trial court denied appellant's motion. It reasoned:

> The Court finds that the police had probable cause to arrest [appellant], based on the information from the two informants. . . . In this case, the Court finds that [appellant] was not in his house when he was arrested, but he was outside in the yard and that Harpster identified him as the person who fit the description.  So the Court finds they had probable cause to arrest him and, of course, the search was incident to the arrest.

Appellant was subsequently convicted of possession of cocaine in violation of Code § 18.2-250.

## II.

## WARRANTLESS SEARCH INCIDENT TO ARREST

5

Appellant contends the trial court erred when it concluded that Officer Hoyt's search of his person was conducted incident to a lawful arrest. Appellant argues that Officer Harpster's arrest of him was unlawful because (1) Officer Harpster lacked probable cause to believe that appellant had committed a criminal offense and (2) the arrest was executed within the "curtilage" of his home without a warrant. Although we find that Officer Harpster possessed probable cause to arrest appellant, we hold that the warrantless arrest of appellant in the curtilage of his home was unlawful.

Generally, evidence obtained by searches and seizures in violation of a defendant's Fourth Amendment rights is inadmissible at a criminal trial. See Mapp v. Ohio, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961); Weeks v. United States, 232 U.S. 383, 391-93, 34 S. Ct. 341, 344, 58 L.Ed. 652 (1914). At a hearing on a defendant's motion to suppress evidence allegedly obtained in violation of the Fourth Amendment, the defendant has the burden of establishing standing by proving that he had a reasonable expectation of privacy in the place searched, Barnes v. Commonwealth, 234 Va. 130, 135, 360 S.E.2d 196, 200 (1987) (citing Rakas v. Illinois, 439 U.S. 128, 131 n.1, 99 S. Ct. 421, 424 n.1, 58 L.Ed.2d 387 (1978)), and the Commonwealth has the burden of proving that the relevant searches or seizures did not violate the defendant's Fourth Amendment rights. See Simmons v. Commonwealth, 238 Va. 200, 204, 380

S.E.2d 656, 659 (1989); Alexander v. Commonwealth, 19 Va. App. 671, 674, 454 S.E.2d 39, 41 (1995). On appeal, we view the evidence in the light most favorable to the prevailing party, granting to it all reasonable inferences fairly deducible therefrom. See Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). We review the trial court's findings of historical fact only for "clear error," but we review de novo the trial court's application of defined legal standards to the particular facts of a case, including determinations of probable cause. See Shears v. Commonwealth, 23 Va. App. 394, 398, 477 S.E.2d 309, 311 (1996); see also Ornelas v. United States, 116 S. Ct. 1657, 1663, 134 L.Ed.2d 911 (1996).

In this case, Officer Hoyt recovered the cash and cocaine from appellant's person during a warrantless search that followed Officer Harpster's warrantless "arrest."[1] Although searches

---

[1] The trial court characterized the initial encounter between Officer Harpster and appellant as an "arrest." After reviewing the evidence in the light most favorable to appellant, who prevailed on this issue, we cannot say this legal conclusion was erroneous. Although "[b]rief, complete deprivations of a suspect's liberty, including handcuffing, 'do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances,'" Thomas v. Commonwealth, 16 Va. App. 851, 857, 434 S.E.2d 319, 323 (1993), aff'd en banc, 18 Va. App. 454, 444 S.E.2d 275 (1994) (citation omitted), appellant's testimony, if believed by the trial court, was legally sufficient to establish that he was arrested by Officer Harpster. Appellant testified that, after Officer Harpster took him into custody and patted him down for weapons, he told appellant, "You're under arrest." Although Officer Harpster testified that he did not verbally indicate to appellant that he was under arrest after handcuffing him on the ground, the trial court, in its role as fact finder, was entitled to credit appellant's testimony and discount Officer Harpster's testimony on this issue. See Mills v. Commonwealth, 14 Va. App. 459, 469,

7

conducted without a judicially-issued warrant are <u>per</u> <u>se</u>
unreasonable under the Fourth Amendment, <u>see</u> <u>Katz v. United</u>
<u>States</u>, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L.Ed.2d 576
(1967) (citations omitted), one of the established exceptions to
the warrant requirement of the Fourth Amendment is for a "search
incident to a lawful arrest." <u>United States v. Robinson</u>, 414
U.S. 218, 224, 94 S. Ct. 467, 471, 38 L.Ed.2d 427 (1973); <u>see</u>
<u>also</u> <u>Chimel v. California</u>, 395 U.S. 752, 762-63, 89 S. Ct. 2034,
2040, 23 L.Ed.2d 685 (1969).  Thus, the constitutional validity
of Officer Hoyt's warrantless search of appellant is contingent
upon the constitutional validity of Officer Harpster's
warrantless arrest.  See <u>Beck v. Ohio</u>, 379 U.S. 89, 91, 85 S. Ct.
223, 225, 13 L.Ed.2d 142 (1964).

A.

Appellant first contends he was illegally arrested because
Officer Harpster lacked probable cause to believe that appellant
had committed a criminal offense.  Specifically, appellant argues
that the information provided by the two informants that he was
selling cocaine could not provide probable cause to arrest him
because the reliability of this information was not sufficiently
established.  We disagree.

"Whether [a warrantless] arrest was constitutionally valid
depends . . . upon whether, at the moment the arrest was made,
the officers had probable cause to make it . . . ."  <u>Id.</u> at 91,
418 S.E.2d 718, 723 (1992).

8

85 S. Ct. at 225.

> Probable cause exists where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.

Brinegar v. United States, 338 U.S. 160, 175-76, 69 S. Ct. 1302, 1310-11, 93 L.Ed. 1879 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162, 45 S. Ct. 280, 288, 69 L.Ed. 543 (1925)). The determination of probable cause by police officers depends upon "practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," Brinegar, 338 U.S. at 175, 69 S. Ct. at 1310, and courts must view and weigh the evidence supporting probable cause "'as understood by those versed in the field of law enforcement.'" Illinois v. Gates, 462 U.S. 213, 231-32, 103 S. Ct. 2317, 2328-29, 76 L.Ed.2d 527 (1983) (quoting United States v. Cortez, 449 U.S. 411, 418, 101 S. Ct. 690, 695, 66 L.Ed.2d 621 (1981)).

When making a warrantless arrest, an officer "'may rely upon information received through an informant, rather than upon his direct observations,'" so long as the officer has reasonable grounds to believe that the informant's statement is true. Id. at 242, 103 S. Ct. at 2334 (citation omitted); see also Draper v. United States, 358 U.S. 307, 312-14, 79 S. Ct. 329, 333, 3 L.Ed.2d 327 (1959). Because the value and reliability of information provided by informants to the police varies greatly,

the veracity of an informant and the basis of his or her knowledge regarding a particular tip are "relevant considerations" in the totality-of-the-circumstances analysis that guides the determination of probable cause.  Gates, 462 U.S. at 232–33, 103 S. Ct. at 2329 (quoting Adams v. Williams, 407 U.S. 143, 147, 92 S. Ct. 1921, 1924, 32 L.Ed.2d 612 (1972)); see also Alabama v. White, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416, 110 L.Ed.2d 301 (1990) (stating that both the content and reliability of information possessed by the police are considered when determining whether the totality of the circumstances justified an officer's determination of probable cause).  When reviewing an officer's determination of probable cause based upon information provided by an informant, a court should conduct a "balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending [the] informant's tip."  Gates, 462 U.S. at 234, 103 S. Ct. at 2330; see also White, 496 U.S. at 230, 110 S. Ct. at 2416.

We hold that, at the time of appellant's arrest, Officer Harpster had probable cause to believe that appellant had recently committed a drug offense.  Prior to appellant's arrest, Officer Hoyt told Officer Harpster that a thin African-American male with gold teeth wearing blue jeans, a gray shirt, and a gold chain was seen by two informants selling cocaine "in the area of Second and Virginia" near 101 North Virginia Avenue.  Officer Harpster proceeded to the backyard of 101 North Virginia Avenue

10

and arrested appellant after verifying that he matched the description provided by the two informants.

The record indicates that the information provided by the two informants was sufficiently trustworthy to justify Officer Harpster's belief that appellant had in fact recently sold cocaine. The reliability of the informants' information was established by their asserted first-hand knowledge, their independent corroboration of each other's observations, and one of the informant's history of providing accurate information to the police. The first informant, whom Officer Hoyt had known for about one month, gave a detailed description of appellant's appearance and told Officer Hoyt that he personally saw appellant selling cocaine. Officer Hoyt then called the second informant and told him to "see what was going on" near 101 North Virginia Avenue. The record does not indicate whether Officer Hoyt told the second informant anything about the first informant's observations. The second informant called back about twenty-five minutes later and corroborated in detail the information provided by the first informant, including his direct observation of appellant engaging in transactions involving cocaine. The veracity of the second informant was bolstered by his previous work with Officer Hoyt during the preceding three or four months that had led to several arrests. Based on the totality of these circumstances, Officer Hoyt and all of the officers whom he briefed prior to the operation, which included Officer Harpster,

11

had probable cause to arrest appellant.

B.

Appellant next contends that, even if Officer Harpster had probable cause to believe that he was selling or had sold cocaine, his arrest was still unlawful because it was executed within the "curtilage" of his home without a warrant. We agree.

12

1.

Although the Fourth Amendment permits law enforcement officers to make warrantless arrests in public places upon probable cause, see United States v. Watson, 423 U.S. 411, 423-24, 96 S. Ct. 820, 828, 46 L.Ed.2d 598 (1976), warrantless entries into a suspect's home in order to arrest a suspect violate the Fourth Amendment unless justified by exigent circumstances or consent. See Payton v. New York, 445 U.S. 573, 575, 100 S. Ct. 1371, 1374-75, 63 L.Ed.2d 639 (1980). In support of this "warrant requirement" for entries into the home, the United States Supreme Court has stated:

> In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

Payton, 445 U.S. at 589-90, 100 S. Ct. at 1382.

Consistent with the common law understanding of the extent of the "home," the Supreme Court has held that the Fourth Amendment protections that apply to the house also apply to the "curtilage" of the house. See Oliver v. United States, 466 U.S. 170, 180, 104 S. Ct. 1735, 1742, 80 L.Ed.2d 214 (1984) (stating that the curtilage "has been considered part of the home itself for Fourth Amendment purposes"); United States v. Dunn, 480 U.S. 294, 301, 107 S. Ct. 1134, 1140, 94 L.Ed.2d 326 (1987) (stating that areas within the curtilage are "placed under the home's 'umbrella' of Fourth Amendment protection"); Dow Chemical Co. v.

13

<u>United States</u>, 476 U.S. 227, 235, 106 S. Ct. 1819, 1825, 90

L.Ed.2d 226 (1986) (stating that "the curtilage doctrine evolved

to protect much the same kind of privacy as that covering the

interior of a structure"); <u>see also</u> <u>United States v. Van Dyke</u>,

643 F.2d 992, 993 (4th Cir. 1981); <u>State v. Walker</u>, 154 Wis.2d

158, 182-83, 453 N.W.2d 127, 137 (1990); <u>cf.</u> <u>Wellford v.</u>

<u>Commonwealth</u>, 227 Va. 297, 302, 315 S.E.2d 235, 237-38 (1984)

(citing <u>Oliver</u>, 466 U.S. at 180, 104 S. Ct. at 1742).[2]

> The protection afforded the curtilage is
> essentially a protection of families and
> personal privacy in an area intimately linked
> to the home, both physically and
> psychologically, where privacy expectations
> are most heightened.

<u>California v. Ciraolo</u>, 476 U.S. 207, 212-13, 106 S. Ct. 1809,

1812, 90 L.Ed.2d 210 (1986).  Thus, absent (1) exigent

circumstances and probable cause or (2) consent, law enforcement

agents cannot enter the curtilage of a person's home either to

---

[2]The concept that the legal protections afforded to a dwelling house also extend to the curtilage originated at common law.  <u>See</u> <u>Dunn</u>, 480 U.S. at 300 & n.3, 107 S. Ct. at 1139 & n.3.  The United States Supreme Court has stated that "[t]he [curtilage] concept plays a part . . . in interpreting the reach of the Fourth Amendment" -- apparently because the common-law understanding of the extent of the home sheds light on the Framers' intended meaning of the word "houses" in the text of the Fourth Amendment.  <u>See</u> <u>id.</u> at 300, 107 S. Ct. at 1139 (citing <u>Hester v. United States</u>, 265 U.S. 57, 59, 44 S. Ct. 445, 446, 68 L.Ed. 898 (1924)); <u>Oliver</u>, 466 U.S. at 178-80, 104 S. Ct. at 1741-42; <u>cf.</u> <u>Payton</u>, 445 U.S. at 591 n.33, 100 S. Ct. at 1382-83 n.33 (stating that "[a]n examination of the common-law understanding of an officer's authority to arrest sheds light on the obviously relevant, if not entirely dispositive, consideration of what the Framers of the [Fourth] Amendment might have thought to be reasonable").

search or seize without previously obtaining a warrant.  See <u>Van Dyke</u>, 643 F.2d at 993; <u>Walker</u>, 154 Wis.2d at 182-83, 453 N.W.2d at 137 (holding that "<u>Payton</u> and <u>Oliver</u> require that police obtain a warrant before entering either the home or its curtilage to make an arrest" unless they have both probable cause and exigent circumstances).

As a general proposition, the curtilage of the home protected by the Fourth Amendment is the area immediately surrounding the home "to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'"  <u>Oliver</u>, 466 U.S. at 180, 104 S. Ct. at 1742 (citation omitted).  Although the United States Supreme Court has set forth a general standard defining the extent of the curtilage, whether a particular place is within the curtilage of the home is determined on a case-by-case basis.  See <u>Dunn</u>, 480 U.S. at 301 n.4, 107 S. Ct. at 1139 n.4 (declining the invitation to adopt a "bright-line rule" regarding the extent of the curtilage and stating that a court is required to define the extent of the curtilage by assessing the factors outlined in <u>Dunn</u>).  "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself."  <u>Id.</u> at 300, 107 S. Ct. at 1139; <u>see</u> <u>Wellford</u>, 227 Va. at 302, 315 S.E.2d at 238.

> [C]urtilage questions should be resolved with
> particular reference to four factors:  the
> proximity of the area claimed to be curtilage
> to the home, whether the area is included
> within an enclosure surrounding the home, the

> nature of the uses to which the area is put
> and the steps taken by the resident to
> protect the area from observation by people
> passing by.

Dunn, 480 U.S. at 301, 107 S. Ct. at 1139.  Courts applying these factors should bear in mind that they are intended as flexible, analytical tools to structure an "extent-of-curtilage" analysis and that the "centrally relevant consideration" is always "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."  Id. at 301, 107 S. Ct. at 1139-40.

2.

After analyzing the evidence in the record relevant to the four Dunn factors, we conclude that Officer Harpster entered the curtilage of appellant's home prior to arresting him.  First, the proximity of the place where Officer Harpster arrested appellant was extremely close to appellant's house and could not be viewed by pedestrians and drivers passing in front of the house.  The record established that the back door of appellant's house opened "directly" into the backyard.  The trial court found that appellant was not in his house when Officer Harpster arrested him, and this factual finding is supported by Officer Harpster's testimony that appellant was standing "right in front" of this door when Officer Harpster first saw him.  The record does not indicate whether appellant moved from this location before Officer Harpster arrested him.[3]  Officer Harpster's testimony

_____

[3]Although the trial court found that appellant was "outside

16

indicated that appellant's back door was not visible from the street and that the officer was required to walk behind appellant's house before the back door came into his view. Regarding the "nature of the uses" of the location of appellant's arrest, the area of a residential backyard <u>immediately</u> adjacent to the home's back door is commonly understood as "an area . . . to which the activity of home life extends." <u>Oliver</u>, 466 U.S. at 182 n.12, 104 S. Ct. at 1743 n.12 (stating that the concept of the curtilage "is a familiar one easily understood from our daily experience"). Based on this evidence, we conclude that the area in which appellant was arrested was so intimately tied to the home that appellant could reasonably expect it to be treated as part of his home.

Because Officer Harpster's arrest of appellant was executed after the officer entered the curtilage of appellant's home without a warrant, we hold that the arrest violated the Fourth Amendment. Although Officer Harpster had probable cause to arrest appellant, nothing in the record indicates that his intrusion into appellant's curtilage was justified by exigent circumstances. In addition, the record does not prove that appellant consented to the officer's entry into the curtilage.

---

in the yard" at the time of his arrest by Officer Harpster, this factual finding is not supported by any evidence in the record and is thus "clearly erroneous." Instead, the evidence, when viewed in the light most favorable to the Commonwealth, indicates that appellant was "right in front" of his back door at the time of the arrest.

We disagree with the Commonwealth's argument that this case is controlled by United States v. Santana, 427 U.S. 38, 96 S. Ct. 2406, 49 L.Ed.2d 300 (1976). In Santana, the defendant was spotted by the police "standing in the doorway of her house" after they had probable cause to arrest her. Id. at 40, 96 S. Ct. at 2408. The doorway in question was positioned so that it "exposed [the defendant] to public view, speech, hearing and touch as if she had been standing completely outside her house." Id. at 42, 96 S. Ct. at 2409. As the officers approached, the defendant "retreated into the vestibule of her house" where the officers arrested her. Id. at 40-41, 96 S. Ct. at 2408-09. The United States Supreme Court held that the warrantless arrest executed inside the defendant's home did not violate the Fourth Amendment because it was justified by an exigent circumstance: the arresting officer had "hotly pursued" the defendant into her home after spotting her in a "public place." See id. at 42-43, 96 S. Ct. at 2409-10. The Supreme Court concluded that the defendant's doorway was a "public place" because its proximity to direct interaction with the public rendered it "not . . . an area where [the defendant] had any expectation of privacy." Id. at 42, 96 S. Ct. at 2409. In an apparent reference to the curtilage doctrine, the Court stated:

> While it may be true that under the common law of property the threshold of one's dwelling is "private," as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment [the defendant] was in a "public" place.

18

Id.

This case is distinguishable from Santana because it did not involve the hot pursuit of a fleeing felon from a "public place" into an area protected by the Fourth Amendment's warrant requirement.[4] Although appellant was standing just outside of his back door, his door was not situated so that it exposed him to "public view, speech, hearing, and touch." Id. The record established that appellant's back door was behind his house and not visible from the street. As previously discussed, appellant was within the curtilage of his home when Officer Harpster first saw him, and the extent of the curtilage is by definition the area surrounding the home that "an individual reasonably may expect . . . [to] be treated as the home itself." Id. at 300, 107 S. Ct. at 1139. Thus, unlike the defendant in Santana, appellant did not retreat into his "home" following a knowing exposure to the public. He was within his "home" for Fourth Amendment purposes at all times prior to Officer Harpster's physical intrusion into the curtilage. See Dunn, 480 U.S. at

---

[4]After deciding Santana, the Supreme Court has consistently stated that this case represents one of the exceptions to the rule that warrantless entries into the home or curtilage violate the Fourth Amendment. Specifically, the Court has stated that Santana stands for the proposition that "hot pursuit of a fleeing felon" from a public place is one of the "exigent circumstances" justifying a warrantless arrest inside the home. See Segura v. United States, 468 U.S. 796, 811-12, 104 S. Ct. 3380, 3389, 82 L.Ed.2d 599 (1984); Welsh v. Wisconsin, 466 U.S. 740, 750, 104 S. Ct. 2091, 2097, 80 L.Ed.2d 732 (1984); Steagald v. United States, 451 U.S. 204, 221, 101 S. Ct. 1642, 1652, 68 L.Ed.2d 38 (1981).

19

301, 107 S. Ct. at 1140 (stating that areas within the curtilage are "placed under the home's 'umbrella' of Fourth Amendment protection").

Because Officer Harpster's <u>arrest</u> of appellant was unlawful, the warrantless <u>search</u> incident to this arrest performed by Officer Hoyt likewise violated the Fourth Amendment.  As such, the trial court erred when it refused to suppress the cocaine and cash seized during this search.[5]

We also hold that the trial court erred when it declined to suppress appellant's incriminating statement because its occurrence was not sufficiently attenuated from the unlawful arrest and search to permit its use at trial.  Although appellant was given his <u>Miranda</u> warnings and signed a written waiver, it is well established that such a waiver alone does not sever the causal connection between a Fourth Amendment violation and an otherwise voluntary confession.  <u>See</u> <u>Brown v. Illinois</u>, 422 U.S. 590, 603-05, 95 S. Ct. 2254, 2261-62, 45 L.Ed.2d 416 (1975).  Based on the close proximity in time between the unlawful arrest and the confession -- about one hour -- and the lack of

_____

[5]The Commonwealth argues in its brief that Officer Hoyt's search was lawful because it was conducted pursuant to appellant's consent.  Assuming that appellant did consent to the search, the cash and cocaine still should have been suppressed because appellant's consent was "obtained by exploitation of the illegality of his arrest."  <u>Brown v. Illinois</u>, 422 U.S. 590, 600, 95 S. Ct. 2254, 2260, 45 L.Ed.2d 416 (1975); <u>see</u> <u>Hall v. Commonwealth</u>, 22 Va. App. 226, 229, 468 S.E.2d 693, 695 (1996); <u>Commonwealth v. Ealy</u>, 12 Va. App. 744, 757-58, 407 S.E.2d 681, 689-90 (1991).

20

intervening circumstances, we conclude that appellant's confession is rendered inadmissible by its relationship to the initial illegalities. <u>See</u> <u>Dunaway v. New York</u>, 442 U.S. 200, 218-19, 99 S. Ct. 2248, 2259-60, 60 L.Ed.2d 824 (1979); <u>Brown</u>, 422 U.S. at 604-05, 95 S. Ct. at 2262; <u>Hart v. Commonwealth</u>, 221 Va. 283, 287-89, 269 S.E.2d 806, 809-10 (1980); <u>Watson v. Commonwealth</u>, 19 Va. App. 659, 665-66, 454 S.E.2d 358, 362 (1995); <u>Corey v. Commonwealth</u>, 8 Va. App. 281, 286 n.1, 381 S.E.2d 19, 21 n.1 (1989).

For the foregoing reasons, we reverse the conviction of possession of cocaine and remand for further proceedings consistent with this opinion.

<u>Reversed and remanded</u>.