COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Huff, O'Brien and Athey
Argued at Norfolk, Virginia


ALBIN TREVOR PEARSON

                                                        MEMORANDUM OPINION[*] BY
v.        Record No. 2002-22-1                    JUDGE CLIFFORD L. ATHEY, JR.
                                                          AUGUST 6, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Margaret P. Spencer, Judge Designate

Timothy G. Clancy (Lisa A. Mallory; Clancy & Walter, P.L.L.C., on
briefs), for appellant.

Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
Attorney General), for appellee.


Following a jury trial held in the Circuit Court of the City of Newport News ("trial court"),

Albin Pearson ("Pearson") was convicted of the voluntary manslaughter of Henry Berry, III

("Berry"). Pearson was also convicted for having entered Berry's home with the intent to damage.

Pearson was sentenced on both charges to a total of 10 years and 12 months incarceration, with 5

years suspended. Pearson assigns error to the trial court for: 1) refusing to admit evidence of the

existence of a protective order against Berry; 2) refusing to admit expert testimony based upon a

frame-by-frame analysis of Pearson's body camera video recordings; 3) ruling as a matter of law

that the attempted arrest of Berry was unlawful; and 4) ruling as a matter of law that the entry into

Berry's home was unlawful. Finding no error, we affirm the judgment of the trial court.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

## I. BACKGROUND

On December 27, 2019, Berry called 9-1-1 to report a missing person, his nine-year-old son whom he claimed not to have seen since Thanksgiving. Pearson and Officer Dwight Pitterson ("Officer Pitterson") responded to the 9-1-1 call, subsequently arriving at Berry's apartment. Berry then advised the officers that he was worried about his son who was living with his son's mother. The officers were also shown a FaceTime video of Berry's son, which Berry claimed showed that his son was suffering from a black eye and bruising. However, the child stated in the video recording that any visible injuries he received were as a result of roughhousing with his siblings. Consequently, the officers denied Berry's request to report his son a missing person because Berry knew where his son was residing. The law enforcement officers also advised Berry that any bruising received by his son as a result of playing roughly with his siblings would be insufficient evidence to warrant a welfare check. Pearson also warned Berry that by reporting his son missing when he knew his son's whereabouts, Berry was falsely summoning law enforcement, a criminal offense. Pearson further advised Berry that he was aware of a protective order that was in effect preventing Berry from having contact with his son.

After law enforcement left his apartment, Berry contacted the Newport News 9-1-1 call center six additional times requesting a welfare check on his son. Berry also contacted the Fairfax County Police Department on their non-emergency line twice, requesting that they perform a welfare check on his son who was then residing in Fairfax County with his mother. These additional calls occurred over a period of approximately four hours.

After receiving notice that Berry was making additional 9-1-1 calls, Pearson and Officer Pitterson, joined by Detective Krystal Alexander ("Detective Alexander") and Officer LeMarcus Scott ("Officer Scott"), returned to Berry's apartment. The officers failed to obtain an arrest warrant for Berry prior to returning to the apartment. In addition, before knocking on the front door of

- 2 -

Berry's apartment, the officers agreed that they would attempt to convince him to leave his apartment. They also agreed that if they successfully convinced Berry to exit his apartment, they would arrest him for falsely summoning and or giving a false report to a law enforcement officer in violation of Code § 18.2-461.

In furtherance of their plan, Detective Alexander knocked on Berry's front door. Whereupon Berry opened his front door, stood in the doorway holding his phone, and requested that Detective Alexander view the FaceTime video of his son. Detective Alexander agreed to view the video only if Berry came outside of the apartment building. When Berry insisted on remaining in the doorway to his apartment, Pearson also advised Berry to come outside to speak with the officers. In response, Berry retreated further back into the doorway of his apartment and restated that he did not want to go outside. When Berry subsequently placed his hand on the apartment's front door in a manner as if he intended to close the door or was preparing to do so, Detective Alexander placed her boot in the path of the door to prevent the door from being closed. While Berry was attempting to close the door, both Pearson and Officer Pitterson rushed through the apartment door and attempted to seize Berry. Detective Alexander and Officer Scott followed their fellow officers into Berry's apartment, also attempting to subdue Berry.

Berry began to struggle with the officers as they attempted to wrestle him to the ground. Berry eventually ended up seated on the ground with his back to the wall while the law enforcement officers continued to attempt to place him under arrest. Berry continued to refuse to submit and struggled to escape from the officers' control, eventually prompting Officer Pitterson to deploy his taser against Berry. During the struggle, Berry wrested control of the taser from Officer Pitterson, and Pearson reacted by fatally shooting Berry once in the back with his handgun.

Following an investigation, Pearson was indicted on charges of second-degree murder and entering property with the intent to damage. Before trial, Pearson sought to obtain by subpoena

- 3 -

duces tecum a certified copy of the protective order denying Berry contact with his son. Counsel for Pearson initially contended that the protective order was relevant as evidence of Berry's character in support of Pearson's claim that he shot Berry in self-defense. In response, the Commonwealth moved to quash the subpoena alleging that the protective order would be both inappropriate and inadmissible as character evidence. The trial court subsequently granted the Commonwealth's motion to quash the subpoena.

At trial, over Pearson's objection, the Commonwealth introduced in evidence a video recording of Pearson's first interaction with Berry on December 27, 2019, which the Commonwealth had redacted to exclude any mention of the protective order against Berry. Pearson further objected to the redaction based, in part, on his contention that the protective order was "probative and relevant and material." Pearson also clarified that he did not intend to use the protective order as evidence of Berry's character, but rather to show "the quantum of evidence that Sergeant Pearson had when he did what he did." The Commonwealth also entered in evidence statements made by Berry claiming to have sole custody of his son. In response, Pearson renewed his request to permit the protective order to be entered into evidence, claiming that the Commonwealth had, by entering Berry's claims to having sole custody of his son, opened the door to permit impeaching Berry's statements through entry of the protective order that refuted those claims. The trial court again denied Pearson's request, holding that since Berry's credibility was not at issue, the protective order was not relevant. The Commonwealth subsequently rested its case-in-chief, and Pearson moved to strike the Commonwealth's case. The trial court denied his motion.

During Pearson's case-in-chief, he called Newport News Master Police Officer Wilbur O'Berry ("Officer O'Berry") as an expert witness on the use of tasers and taser training. In addition to educating the jury about tasers and their use, Officer O'Berry explained that he had analyzed the

- 4 -

data saved to Officer Pitterson's taser concerning each pull of the taser's trigger. He then opined that based on the data he analyzed, the taser's trigger had been pulled six times. Officer O'Berry also identified, from his analysis of the officer's body worn camera, the exact time when each of the six trigger pulls occurred. Counsel for Pearson then asked Officer O'Berry if he had been able to determine "the point in time when Mr. Berry got possession of the Taser?" The Commonwealth immediately objected to the line of inquiry, and the trial court sustained the Commonwealth's objection, stating that the testimony solicited "invades the province of the jury. They can see the video. They can see who has it and who does not have it. He's not an expert in that area." To preserve his objection to the trial court's ruling, Pearson later proffered to the trial court the testimony he sought to elicit from Officer O'Berry. The proffered evidence included a graph correlating the timing of certain actions recorded in the body camera footage with the timing of the taser trigger pulls. Pearson sought to use the graph in conjunction with O'Berry's testimony to discuss the timing of the taser trigger pulls in relation to other events depicted in the body camera recordings.

Pearson testified in his own defense. He stated that he shot Berry when Berry "raised [the taser] towards Officer Alexander's face." He explained that shooting Berry was "the only option that I had to stop" Berry from using the taser on the officers. Pearson subsequently rested before renewing his motion to strike. The trial court also denied his renewed motion.

The trial court then reviewed jury instructions submitted by both the Commonwealth and Pearson. Pearson objected to the following instructions given to the jury by the trial court:

> Instruction 19: An officer may not enter a home or the curtilage of the home to arrest someone without a warrant.

> Instruction 19.1: The police are prohibited from making a warrantless and nonconsensual entry into a person's home in order to make an arrest.

Instruction 22: An officer may not arrest someone in his home or on the curtilage outside his home unless the officer secures an arrest warrant. The attempted arrest of Mr. Berry was unlawful.

Instruction 23: Where an officer attempts an unlawful arrest, the officer is an aggressor which gives the arrestee the right to use self-defense to resist so long as the force used is reasonable.

Instruction 24: When the defendant undertook to arrest the decedent, he lacked that authority, and thus, whatever force he used in his attempt to effect the arrest was unlawful. The decedent was entitled to resist the attempted unlawful arrest with such reasonable force as was necessary to repel that being exercised by the officer in his unwarranted undertaking.

After the trial court instructed the jury with respect to the law governing the case, both the Commonwealth and Pearson's counsel made closing arguments to the jury. The jury then retired to deliberate and subsequently returned a verdict of guilty on the lesser-included offense of voluntary manslaughter. The jury also convicted Pearson of entering property with the intent to damage. Following a subsequent sentencing hearing, the trial court sentenced Pearson to ten years and twelve months of incarceration with five years suspended. Pearson appealed.

II. ANALYSIS

A. *Standard of Review*

"[T]he 'admissibility of evidence is within the discretion of the trial court,' and an appellate court will not reject such decision absent an 'abuse of discretion.'" *Williams v. Commonwealth*, 71 Va. App. 462, 487 (2020) (quoting *Tirado v. Commonwealth*, 296 Va. 15, 26 (2018)). "The abuse of discretion standard draws a line—or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)). "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it

- 6 -

would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).

"[W]e review *de novo* the ultimate question of whether law enforcement 'had probable cause to make an arrest.'" *Park v. Commonwealth*, 74 Va. App. 635, 646 (2022) (quoting *Doscoli v. Commonwealth*, 66 Va. App. 419, 424 (2016)). "[T]he question whether a person has been seized in violation of the Fourth Amendment is reviewed *de novo* on appeal." *Reittinger v. Commonwealth*, 260 Va. 232, 236 (2000). "[W]hen the issues are the lawfulness of an arrest and the reasonableness of force used to resist an unlawful arrest, the ultimate questions involve law and fact and are reviewed *de novo* on appeal." *Doscoli*, 66 Va. App. at 424-25 (quoting *Brown v. City of Danville*, 44 Va. App. 586, 603 (2004)).

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). "We review a trial court's decisions in giving and denying requested jury instructions for abuse of discretion." *Holmes v. Commonwealth*, 76 Va. App. 34, 53 (2022) (quoting *Conley v. Commonwealth*, 74 Va. App. 658, 675 (2022)). "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).

B. *The trial court did not err in holding as a matter of law that Pearson unlawfully entered Berry's home and attempted to arrest him, nor did it err in giving the complained of jury instructions in light of that ruling.*

In his third and fourth assignments of error, Pearson contends that he had both the right to arrest Berry and legally entered Berry's home to effect that arrest. From this premise, Berry assigns

error to the trial court's holding that as a matter of law Pearson unlawfully: 1) entered Berry's apartment and 2) attempted to arrest Berry. Pearson also assigns error to Jury Instructions 19, 19.1, 22, 23, and 24, which were given based upon the trial court's ruling on the lawfulness of Pearson's actions. We find no error.

Pearson contends that the trial court erred by not permitting the jury to decide whether Pearson had the right to arrest Berry as well as the right to enter his home to effect that arrest. First, "the question whether a person has been seized in violation of the Fourth Amendment is reviewed *de novo* on appeal" because it is a question of law. *Reittinger*, 260 Va. at 236. "Likewise, 'when the issues are the lawfulness of an arrest and the reasonableness of force used to resist an unlawful arrest, the ultimate questions involve law and fact and are [also] reviewed *de novo* on appeal.'" *Doscoli*, 66 Va. App. at 424-25 (quoting *Brown*, 44 Va. App. at 603). "It is fundamental that the court must respond to questions of law and the jury to questions of fact." *Amonett v. Commonwealth*, 70 Va. App. 1, 8 (2019) (quoting *Gottlieb v. Commonwealth*, 126 Va. 807, 812 (1920)). Thus, to the extent that Pearson contends that the trial court erred in not permitting the jury to determine the legality of the attempted arrest of Berry, this contention is both misguided and simply incorrect.

Hence, we now turn to the issue of whether the trial court erred by holding that the attempted arrest was unlawful. "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyer v. Commonwealth*, 45 Va. App. 473, 480 (2005) (en banc) (quoting *Kyllo v. United States*, 533 U.S. 27, 31 (2001)). "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Id.* (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984)). "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent

circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980). Generally, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Ross v. Commonwealth*, 61 Va. App. 752, 759 (2013) (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)). This "presumption may be overcome" when "the warrant requirement is subject to certain reasonable exceptions." *Id.*

Pearson contends that his attempt to arrest Berry in his apartment, without a warrant, does not violate these well settled principles. In support of this assertion, Pearson first contends that probable cause existed permitting him to arrest Berry for a misdemeanor committed in Pearson's presence. We need not decide if there was in fact probable cause justifying an arrest, because even if there was, as discussed below, Pearson's entry into Berry's home to make the arrest violated the Fourth Amendment.

Pearson then further contends that this case is similar to and governed by *United States v. Santana*, 427 U.S. 38 (1976). In *Santana*, officers went to Santana's home to arrest her for distributing heroin. *Id.* at 40. Officers already had probable cause to arrest her for a felony before their arrival at the home. *Id.* Upon arrival at the house, officers "saw Santana standing in the doorway of" her home "with a brown paper bag in her hand." *Id.* "They pulled up to within 15 feet of Santana" before exiting their van and "shouting 'police,' and displaying their identification." *Id.* The defendant withdrew into her home. *Id.* Officers pursued her into the vestibule of her home, where they caught and arrested her. *Id.*

Santana challenged her arrest under the Fourth Amendment. The Supreme Court reasoned that even though "it may be true that under the common law of property the threshold of one's dwelling is 'private,' as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a 'public' place." *Id.* at 42. "She was not in an area where she had any expectation of privacy," because "'[w]hat a person knowingly exposes to

- 9 -

the public, even in his own house or office, is not a subject of Fourth Amendment protection.'" *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)).[1] The Court reasoned that Santana "was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.* Thus, the Court reasoned that arresting her in her doorway did not require a warrant. *Id.*

The Supreme Court then further addressed "whether her act of retreating into her house could thwart an otherwise proper arrest." *Id.* The Court concluded that the case "involve[ed] a true 'hot pursuit'" and that "[t]he fact that the pursuit here ended almost as soon as it began did not render it any the less a 'hot pursuit' sufficient to justify the warrantless entry into Santana's house."

---

[1] We note that *United States v. Santana*, 427 U.S. 38 (1976), was decided four years before *Payton v. New York*, 445 U.S. 573 (1980). Certain potential lines of reasoning that might flow from the Court's reasoning in *Santana* and suggest expansive warrantless arrest powers when law enforcement officers interact with a suspect in the doorway of the suspect's home are complicated by the Court's clear ruling in *Payton* that "[a]bsent exigent circumstances [the] threshold [of a home] may not reasonably be crossed without a warrant." 445 U.S. at 590.

We further note that this Court has previously implicitly addressed the apparent tension between the Supreme Court's reasoning in *Santana* and the well settled rule that under the Fourth Amendment, the curtilage of a home is subject to the same protections as the home itself. *Jefferson v. Commonwealth*, 27 Va. App. 1, 15-16 (1998). "[W]hether a particular place is within the curtilage of the home is determined on a case-by-case basis." *Id.* at 16. "The extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Id.* (quoting *United States v. Dunn*, 480 U.S. 294, 300 (1987)). In *Jefferson*, this Court distinguished the facts of the case that involved an arrest beginning in the private backyard of a home from those in *Santana*, where "[t]he doorway in question was positioned so that it 'exposed [the defendant] to public view, speech, hearing and touch as if she had been standing completely outside her house.'" *Id.* at 18 (second alteration in original) (quoting *Santana*, 427 U.S. at 42).

In light of *Payton*, it seems that *Santana* stands for the proposition that one standing outside the threshold of their doorway, though in their curtilage, may not enjoy all the Fourth Amendment protections usually enjoyed in their home and curtilage if they are "positioned so that [they are] 'exposed . . . to public view, speech, hearing and touch as if [they] had been standing completely outside [their] house," *Jefferson*, 27 Va. App. at 18 (quoting *Santana*, 47 U.S. at 42), and they are so exposed that they may not "reasonably . . . expect that the area in question should be treated as the home itself," *id.* at 16 (quoting *Dunn*, 480 U.S. at 300). However, as explained below, the evidence shows that Berry was inside his home, and thus under *Payton* enjoyed all the protections of the Fourth Amendment.

*Id.* at 42-43. Finally, the Supreme Court noted that "there was likewise a realistic expectation that any delay would result in destruction of evidence." *Id.*

Pearson contends that the only difference between the facts here and in *Santana* is that Berry was under suspicion of committing a misdemeanor rather than a felony. He asserts that this difference is insignificant and does not warrant distinguishing this case from the *Santana* decision. He implicitly argues that Berry was in public when officers initiated the arrest and that his flight back into his apartment justified police entry of the home.

We disagree that suspicion of a misdemeanor as opposed to suspicion of a felony constitutes the only difference between the facts in the case at bar and those in *Santana*. We are aided in our analysis by the facts and reasoning in *United States v. McCraw*, 920 F.2d 224 (4th Cir. 1990). In that case, several federal law enforcement agents knocked on the door of a hotel room. *Id.* at 226. The agents had probable cause to suspect the occupant of the room had illegally distributed cocaine, but they had not obtained a warrant for his arrest. *Id.* at 228. The defendant "opened the door about halfway while standing inside his room," but when he saw the agents, "he attempted to close the door." *Id.* at 226. "Several officers with weapons drawn forced their way inside and arrested" him. *Id.* The Fourth Circuit found that one "does not surrender his expectation of privacy nor consent to [law enforcement's] entry" when one "partially opens the door to determine the identity of officers knocking on the door." *Id.* at 228. Urged by the government to find *Santana* dispositive, the Fourth Circuit distinguished the facts in the two cases, noting that:

> the arrestee in the present case was not standing on the threshold of the doorway at the time the agents arrived. Instead, [the arrestee] came to the door in response to the agents' knocking. Moreover, [the arrestee] did not relinquish completely his expectation of privacy. At trial, government witnesses did not even contend that [the arrestee] was on the threshold of the doorway, instead admitting that he opened the door only halfway to determine who was knocking, attempted to close it, and that they forced their way inside to make the arrest. By opening the door only halfway, [the arrestee] did not voluntarily expose himself to the public to the same extent as the

> arrestee in *Santana*. He certainly did not consent to the officers'
> entry into his room to arrest him.

*Id.* at 229.

Although the facts in *McCraw* and the facts here are not perfectly harmonious, here the facts are much more similar to those in *McCraw* than those in *Santana*. Unlike Santana, and like the defendant in *McCraw*, Berry was not visible to public observation when the police arrived. *Santana*, 427 U.S. at 42. Instead, he was inside his apartment and only opened the door of his apartment in response to law enforcement knocking at his apartment door. Although Berry opened his apartment door and stood in his doorway speaking with police momentarily, he expressly refused to come outside when asked to do so. Instead, he twice, unequivocally stated his desire to remain in his home, and even after being advised by the police that they would only help him if he came outside, he attempted to close the front door of his apartment. He began to withdraw from public view and "retreat into his own home" to "be free from unreasonable governmental intrusion." *Kyer*, 45 Va. App. at 480 (quoting *Kyllo*, 533 U.S. at 31). It was only at this point that Detective Alexander put her boot in the doorway to prevent his apartment door from closing. In addition, both Pearson and Officer Pitterson at nearly the same time rushed past Detective Alexander, forced the apartment door open, and attempted to seize Berry.

Thus, unlike in *Santana*, the attempted arrest did not begin until after Berry had reentered the private, constitutionally protected sphere of his home. The evidence is clear that only after he had stepped back from the threshold and begun closing the door did the police escalate the situation and attempt to seize him. Thus, unlike in *Santana* where the police began the attempt to lawfully arrest Santana in public and followed the fleeing defendant into her home, 427 U.S. at 42-43, the police initiated the attempted arrest of Berry when he was in a constitutionally protected place and not in a public place justifying warrantless police entry. Just as in *McCraw*, this entry and arrest was unlawful.

Further, unlike *Santana*, there was no concern that unless an arrest was made speedily, evidence of the crime would be lost. *Id.* at 43 ("Once Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence."). Instead, call records and witness testimony constituting evidence of the alleged false reports were entirely safe from any destruction by Berry.

Because Berry was in the constitutionally protected sphere of his home when the arrest was initiated, there was no pursuit beginning in a public place, and there was no fear that Berry could destroy evidence, this case is distinguishable from and not governed by *Santana*. Rather, for the same preceding reasons, Pearson's attempted arrest was in violation of Berry's Fourth Amendment rights.

Alternatively, Pearson argues that entry of the apartment was justified by the presence of exigent circumstances. We also find this reasoning unavailing.

The exigent circumstances "exception applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *White v. Commonwealth*, 73 Va. App. 535, 553 (2021) (quoting *Ross*, 61 Va. App. at 759). There is no "final and comprehensive list of all exigent circumstances which might justify a warrantless entry." *Verez v. Commonwealth*, 230 Va. 405, 410 (1985). However, the Supreme Court has recognized several considerations relevant to determining if an exigency exists justifying warrantless entry of the home:

> (1) the degree of urgency involved and the time required to get a warrant; (2) the officers' reasonable belief that contraband is about to be removed or destroyed; (3) the possibility of danger to others, including police officers left to guard the site; (4) information that the possessors of the contraband are aware that the police may be on their trail; (5) whether the offense is serious, or involves violence; (6) whether officers reasonably believe the suspects are armed; (7) whether there is, at the time of entry, a clear showing of probable cause; (8) whether the officers have a strong reason to believe the suspects are actually present in the premises; (9) the likelihood of

escape if the suspects are not swiftly apprehended; and (10) the suspects' recent entry into the premises after hot pursuit.

*Id.* at 410-11.

The foregoing is not an exhaustive list of factors, nor are they "a checklist to be applied mechanically with some raw number of factors resulting in a finding of exigency." *White*, 73 Va. App. at 555. Also, these "considerations should not be viewed in binary terms, either 'yes' a factor is present or 'no' it is not." *Id.* Rather, "each of the considerations, much like the overarching question of exigency itself, represents a continuum or a sliding scale with some circumstances warranting more concern than others even if a factor is nominally present in both instances." *Id.* Finally, "the exigency analysis requires a review of 'the totality of the circumstances.'" *Id*. (quoting *Missouri v. McNeely*, 569 U.S. 141, 149 (2013)).

Pearson contends that Berry created an emergency by making six calls to the Newport News 9-1-1 call center and three calls to Fairfax County police on their non-emergency number attempting to make false reports about his son's safety. Berry's repeated false reports to law enforcement prompted Pearson and three other officers to return to Berry's residence, thus limiting their availability to perform other more pressing duties. In further support of Pearson's assertion that exigent circumstances justified both the warrantless entry and subsequent arrest of Berry, Pearson cites the effect of the repeated calls by Berry consuming the scarce resources of the call centers. Pearson further speculates that had law enforcement waited to obtain a warrant, "Berry's conduct could have limited the fire department being dispatched to a house fire; medics being dispatched to someone having a heart attack; or the police being dispatched to a crime of violence."

Though, "[f]alse crime reports compel police to divert scarce resources toward unproductive ends, thereby reducing the availability of resources to catch real criminals," *Dunne v. Commonwealth*, 66 Va. App. 24, 30 (2016), Berry's actions here did not create an exigent circumstance overcoming the robust constitutional protections he enjoyed in his home. In addition,

- 14 -

Pearson fails to point to any authority in which a mere theoretical strain on dispatch and law enforcement resources was found to constitute an exigency rendering warrantless entry of a home reasonable.

> Properly understood, the urgency inquiry is focused on whether there is an emergency situation, such as continuing criminal activity, a person requiring medical care, or the destruction of evidence, that likely will worsen if the officers take the time necessary to get a warrant. To the extent it appears that there is no imminent change to the circumstances about to occur and that the status quo largely can be maintained while the officers seek a warrant, the situation is not 'urgent' for the purposes of an exigency analysis.

*White*, 73 Va. App. at 556-57.

Moreover, when considered on a sliding scale, under the totality of the circumstances, the situation here was not so urgent that it constituted an exigency justifying a warrantless entry of the home. The emergency created was largely theoretical. No evidence was presented that any person required medical attention; there was no concern that evidence would be destroyed; there was no risk that the status quo would change. Although Berry could have been expected to continue engaging in the criminal activity of making false reports to law enforcement, the danger posed by this is minimal compared to that posed by crimes of violence. There was no indication the situation would worsen if the police had taken the time to obtain a warrant. Thus, the situation here did not create an exigency rendering warrantless entry of Berry's home reasonable.

Since *Santana* is not controlling and there was no exigent circumstance requiring immediate entry, regardless of whether Pearson possessed probable cause to arrest Berry for making a false report to law enforcement, his attempted arrest was unconstitutional. Further, since the trial court did not err by holding as a matter of law that Pearson's entry into the home and attempted arrest of Berry were unlawful, the jury instructions flowing from that holding were not given in error. The objected to jury instructions were accurate statements of law, and the trial court did not abuse its discretion in giving them to the jury.

- 15 -

C. *The trial court did not abuse its discretion when it refused to admit evidence that Pearson knew a protective order had been entered against Berry.*

Pearson also asserts that the trial court erred in refusing admission of evidence demonstrating Pearson's knowledge of the protective order limiting Berry's contact with his son. He bases this contention upon two arguments. First, he contends that because Pearson's knowledge of the protective order factored into his decision-making process and the formation of probable cause to arrest Berry, it was relevant and material evidence. Second, he argues that preventing the jury from hearing about the protective order allowed the Commonwealth to argue disingenuously that Berry was a concerned father, thus portraying him as a sympathetic victim to the jury. We disagree.

"All relevant evidence is admissible . . . ." Va. R. Evid. 2:402. "Evidence that is not relevant is not admissible." *Id.* "Evidence is relevant if it has any logical tendency, however slight, to establish a fact at issue in the case." *Utz v. Commonwealth*, 28 Va. App. 411, 418 (1998) (quoting *Ragland v. Commonwealth*, 16 Va. App. 913, 918 (1993)). "'Relevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401.

Whether Pearson had probable cause to arrest Berry is irrelevant because, as discussed above, the attempted arrest was illegal because it occurred in Berry's home without a warrant. Since the entire question of probable cause is irrelevant, Pearson's knowledge of the protective order factoring into the formation of probable cause and Pearson's decision to attempt to arrest Berry is also irrelevant. The trial court did not err in excluding this irrelevant and therefore inadmissible piece of evidence. Thus, the ruling of the trial court is affirmed.

Finally, Pearson made no objection to the Commonwealth's argument that Berry was a concerned father. Rule 5A:18 precludes our review of any error the trial court was not given an opportunity to cure. *Commonwealth v. Bass*, 292 Va. 19, 26 (2016) ("The rule requires litigants to

make their objections 'at a point in the proceeding when the trial court is in a position not only to consider the asserted error, but also to rectify the effect of the asserted error.'" (quoting *Scialdone v. Commonwealth*, 279 Va. 422, 437 (2010))). Pearson's failure to object to the Commonwealth's argument precluded the trial court from addressing any impropriety, and therefore we will not review this untimely raised objection.

D. *The trial court did not err in refusing to permit Officer O'Berry to engage in a frame-by-frame analysis of the body camera footage.*

Pearson also argues that had Officer O'Berry been permitted to testify as to his frame-by-frame analysis of admitted body camera footage, the jury would have gained an understanding of the video not possible by their own review of the video. He contends that this enhanced understanding would have been helpful to the jury in determining whether Pearson acted with malice and in evaluating if he had a reasonable fear justifying his actions as self-defense or defense of others. We disagree.

Virginia Rule of Evidence 2:702(a)(ii) permits the use of expert testimony in criminal proceedings when "the court finds that the subject matter is beyond the knowledge and experience of ordinary persons, such that the jury needs expert opinion in order to comprehend the subject matter, form an intelligent opinion, and draw its conclusions." Thus, "expert testimony concerning matters of common knowledge or matters as to which the jury are as competent to form an opinion as the witness is inadmissible." *Coppola v. Commonwealth*, 220 Va. 243, 252 (1979).

Given the deferential standard of review, we cannot conclude that the trial court erred in determining that the jury was as competent as Officer O'Berry to watch the video and determine what occurred. Pearson argues that the jury was unable to manipulate the video and go frame-by-frame and thus could not as precisely correlate the timing of the taser's firing with the events in the video as Officer O'Berry would have been able to do if permitted to testify concerning the video. Whether that is true or not, it does not change the fact that watching a video of a violent

- 17 -

encounter and determining what it portrays is a task for which the jury was as competent as O'Berry, and therefore, there was no error.

## III. Conclusion

For the foregoing reasons, we find no error. Thus, the judgment of the trial court is affirmed.

*Affirmed.*